[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 23, 2002
THOMAS K. KAHN
CLERK

No. 00-13002

D.C. Docket No. 98-03655 CV-RWS-1

STRATEGIC INCOME FUND, L.L.C.,
HENNESSY CADILLAC, INC. et al.,

Plaintiffs-Appellants,

versus

SPEAR, LEEDS & KELLOGG CORPORATION,
FIRST OPTIONS OF CHICAGO, INC.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Georgia

**(September 23, 2002)**

Before TJOFLAT, BLACK and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

I.

This case arises out of the relationship between Strategic Income Fund ("SIF"), a Georgia limited liability company[1] formed for the purpose of trading in options primarily through the Chicago Board Options Exchange (the "CBOE"); SIF's individual members (the "Members"); E. Thomas Jung, the manager of SIF and the general partner of ETJ Partners ("ETJ"), a purported broker-dealer and market maker at the CBOE;[2] and LIT Clearing Services, Inc. ("LIT"), a firm that provided clearing services for broker-dealers and market makers at the CBOE, including ETJ.[3]

Between September 1994 and September 1998, SIF bought and sold options

---

[1] See O.C.G.A. §§ 14-11-100 et seq.

[2] As noted infra, this appeal turns on the sufficiency of Count IV of the plaintiffs' third amended complaint. The facts stated in the text are therefore drawn from that pleading. Regarding ETJ, Count IV does not state whether it is a general partnership, a limited partnership, or a corporation. Whatever its status as an entity, we assume ETJ is located in Chicago, Illinois since it filed a bankruptcy case there.

[3] On October 1, 1998, LIT merged with defendant First Options of Chicago, Inc. ("First Options") and was consequently dismissed as a defendant by the district court. First Options is a wholly owned subsidiary of defendant Spear, Leads & Kellogg Corporation. For the sake of simplicity, we use LIT to refer to actions of all defendants.

traded on the CBOE through ETJ, who acted as SIF's broker.[4]  Jung, acting in his

respective roles within SIF and ETJ, handled these transactions on behalf of both

entities. All of these trades were cleared by LIT.  From time to time, as these

transactions were taking place, SIF's members pledged securities to LIT as

collateral for SIF's purchases through ETJ.  While Jung was trading for SIF

through ETJ, he was also buying and selling options for other individuals – also

through LIT and apparently relying upon the collateral pledged by SIF's Members.

By September 1998, ETJ had become indebted to LIT for a sum in excess of $22

million.  When ETJ failed to pay this debt, LIT sold the pledged securities (valued

at more than $21 million) to satisfy it.

In an effort to recoup their loses, SIF and its Members brought this law suit

against LIT seeking damages under federal and state law.  (These plaintiffs did not

sue Jung and ETJ because Jung and ETJ have commenced bankruptcy proceedings

in the United States Bankruptcy Court for the Northern District of Illinois, and the

automatic stay provided by 11 U.S.C. § 362 is in place.)  The district court

dismissed the plaintiffs' federal securities law claims, as alleged in Count IV of

their second amended complaint, and declined to exercise supplemental

---

[4]  Any options trading SIF's members may have done individually are not involved in this litigation.

3

jurisdiction over the plaintiffs' state law claims. SIF and its Members thereafter moved the court for reconsideration, to alter judgment, and for leave to file a third amended complaint. The court denied their motions, and the plaintiffs now appeal. They contend that Count IV of their second amended complaint states a case under Sections 10(b)[5] and 20[6] of the Exchange Act of 1934 and Rule 10b-5.[7] In the alternative, the plaintiffs contend that Count IV of their proposed third amended complaint states such a claim. We disagree, and therefore affirm.

II.

[5] Section 10, 15 U.S.C. § 78j, states in pertinent part as follows:
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange – . . .
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

[6] Section 20, 15 U.S.C. § 78t, creates liability for "controlling persons and persons who aid and abet violations." The plaintiffs contend that LIT's successor and parent, see supra note 3, are liable for LIT's actions under this section if not directly under Section 10.

[7] Rule 10b-5, 17 C.F.R. § 240.10b-5, states that:
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

4

The district court's orders of December 29, 1999, and May 8, 2000, explain why Count IV, as framed in both the second and third amended complaints, fails to state a claim for relief under federal securities law. We find no fault in the court's reasoning or application of the law to the facts as pled.[8] We perceive no need summarize the court's analysis of the plaintiffs' Count IV claims here. We think it necessary, however, to say a few words about the plaintiffs' pleadings.

The second and third amended complaints are quintessential "shotgun" pleadings.[9] The typical shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation

_____

[8] The court did err in converting the defendants' Rule 12(b)(6) motion to dismiss the second amended complaint into a Rule 12(c) motion for judgment on the pleadings. Rule 12(c) does not come into play until "[a]fter the pleadings are closed." The pleadings in this case were not closed because the defendants had not answered the second amended complaint. The court's error, however, is of no moment. Whether the court examined Count IV of the second and third amended complaints under Rule 12(b)(6) or Rule 12(c), the question was the same: whether the count stated a claim for relief.

[9] This court has addressed the topic of shotgun pleadings on numerous occasions in the past, often at great length and always with great dismay. See, e.g., Byrne v. Nezhat, 261 F.3d 1075, 1128-34 (11th Cir. 2001) ("Shotgun pleadings . . . impede[] the due administration of justice and, in a very real sense, amount[] to obstruction of justice.") (internal citation omitted); Magluta v. Samples, 256 F.3d 1282, 1284-85 (11th Cir. 2001) (per curium) (refusing to address and decide serious constitutional issues on the basis of a "quintessential 'shotgun' pleading of the kind [this court has] condemned repeatedly, beginning at least as early as 1991" because "[i]t is in no sense the 'short and plain statement of the claim' required by Rule 8"); Anderson v. Dist. Bd. of Trustees of Cent. Fl. Comm. Coll., 77 F.3d 364, 366 (11th Cir. 1996) ("[Plaintiff's] complaint is a perfect example of 'shotgun' pleading in that it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.") (internal citation omitted); Pelletier v. Zweifel, 921 F.2d 1465, (11th Cir. 1991) (describing "quintessential shotgun pleadings" complete with "rambling recitations" and "factual allegations that could not possibly be material" that force the "district court [to] sift through the facts presented and decide for [itself] which were material to the particular cause of action asserted").

where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions.  Consequently, in ruling on the sufficiency of a claim, the trial court must sift out the irrelevancies, a task that can be quite onerous.[10]  In this case, the proposed third amended complaint contains 127 paragraphs (six more than the second amended complaint) and nine counts, with each count incorporating by reference every paragraph that precedes it.[11]  Instead of requiring the plaintiffs to replead, the court attempted – and admirably so – to ascertain exactly which facts formed the basis of the plaintiffs' federal law claims.

We have read Count IV – including all that it incorporates by reference – several times; yet, we must confess that we are at a loss to explain what allegedly transpired between and among SIF, its Members, Jung, ETJ, and LIT with respect

---

[10]  Indeed, the aggregate negative effects of shotgun pleadings on trial courts have been noted with great concern by this court.  See, e.g., Byrne, 261 F.3d at 1131 ("Shotgun pleadings, if tolerated, harm the court by impeding its ability to administer justice.  The time a court spends managing litigation framed by shotgun pleadings should be devoted to other cases waiting to be heard."); Cramer v. Florida, 117 F.3d 1258, 1263 (11th Cir. 1997) (noting that "[s]hotgun pleadings . . . exact an intolerable toll on the trial court's docket"); Ebrahimi v. City of Huntsville Bd. of Educ., 114 F.3d 162, 165 (11th Cir. 1997) (per curium) ("[S]hotgun notice pleadings . . . impede the orderly, efficient, and economic disposition of disputes."); Anderson, 77 F.3d at 367 (noting the "cumbersome task of sifting through myriad claims, many of which may be foreclosed by various defenses" that judges face in connection with shotgun pleading).

[11]  Count I "Fraud," Count II "Conversion," Count III "Breach of Fiduciary Duties," Count IV "Securities Fraud – Violation of § § 10(b) and 20 of The Exchange Act and Rule 10b-5," Count V "Securities Fraud – Violation of O.C.G.A. § 10-5-12," Count VI "Accounting," Count  VII "Constructive Trust," Count VII "Negligence," and Count IX "Conspiracy."

6

to the securities the Members pledged as collateral.[12]  One reason is the omission of several material facts in Count IV; another is that the drafter of the pleading chose to write several critical paragraphs in the passive, rather than the active, voice leading to unnecessary confusion and obfuscation.  Take, for example, paragraph 30, which is identical in both amended complaints.  It reads as follows:

> In connection with SIF's investment trading through Jung and ETJ, the members of SIF were required to pledge certain assets, including publicly traded securities (the "Pledged Securities"), as collateral for SIF's trading accounts with LIT.  The Pledged Securities were owned by certain of the individual members of SIF and had been pledged to SIF as security for those members' individual investments in SIF.

Here, the pleader refers to "SIF's trading accounts" with LIT as though their existence was fact.  Nowhere else in the pleading, however, does the pleader allege that SIF had opened such accounts with LIT.  Rather, Count IV states that ETJ was the party with the account(s) at LIT.  The second sentence of the paragraph states, again as fact, that the "[Pledged Securities] had been pledged to SIF as security for

---

[12]  In drafting Count IV, counsel was certainly mindful of the general rule that clearing firms have no have fiduciary relationship with the customers of introducing brokers, see, e.g., Connolly v. Havens, 763 F. Supp. 6, 10 (S.D.N.Y. 1991) ("It is well-established that a clearing firm . . . does not have a fiduciary relationship with the customers . . . of the introducing broker with which it has contracted to perform clearing services."), and therefore needed to avoid the rule's consequences.  In an attempt to avoid the rule, counsel alleged that ETJ had not properly registered with the Securities and Exchange Commission, and that this somehow transformed LIT from a clearing firm into a primary broker, assuming ETJ's role with respect to the SIF transactions.

the[] members' individual investments in SIF." This statement leads to more questions than answers. One must ask, why would the members pledge securities to SIF? Was SIF advancing funds in their behalf? Presumably – though the pleader does not tell us – SIF paid ETJ cash (or its equivalent) for the options it asked ETJ to purchase for its account, since the law would not permit ETJ to finance SIF's purchases. Material facts that detail the exact nature of the relationship between the individual plaintiffs, SIF, ETJ, and LIT are conspicuously absent.

The passive voice leads to still more questions: Who "required" the members of SIF "to pledge certain assets . . . as collateral for SIF's trading accounts with LIT"? Was it LIT, ETJ, or SIF itself? To whom were the pledges made – were they made to ETJ or to LIT? And on what conditions were the pledges made; in other words, what event(s) would trigger the pledgee's right to seize the collateral? As a result of this passive narrative, the pleader does not make explicit – perhaps by a conscious, tactical choice – whose debt to LIT was being secured by the Members' pledges. We glean the identity of that obligation from a consideration of the Count IV allegations as a whole: ETJ was LIT's debtor and the Members' securities were pledged to secure ETJ obligation(s). The terms of the pledges are not clear from Count IV's allegations, but, based on the nature of the

8

claims made by plaintiffs, one must assume that LIT sold the pledged securities in accordance with the terms stated in the pledge instruments. If LIT seized and sold the securities contrary to the terms expressed in the pledge instruments, one would expect the pleader to include in the complaint a count which alleged that LIT had done so.[13] Moreover, one would expect the pleader to have attached to the complaint copies of the pledge instruments.

We do not focus on paragraph 30 because it is necessarily the fatal flaw in plaintiffs' second and third amended complaints, but rather because it is indicative of problems with the complaints as a whole and with most shotgun pleadings. More could be said about the manner in which the pleader drafted the second and third amended complaints in this case, but we stop here.

AFFIRMED.

---

[13] In fact, Count II of plaintiffs' complaint alleges conversion of their securities but does not make any explicit reference to the terms of the pledge instruments.

BLACK, Circuit Judge, concurs in the result.