[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 10, 2003
THOMAS  K. KAHN
CLERK**

_____

No. 01-13794

_____

D.C. Docket No. 99-00070-CV-T-30-8

JOHN WAYNE LUMLEY,

Plaintiff-Counter
Defendant-Appellee,

versus

CITY OF DADE CITY, FLORIDA,
a municipal corporation, et al.,

Defendants,

MICHAEL WILKES,
Lieutenant for the Dade City Police
Deparment, in his individual capacity,
LINDA LEGGETT REGISTER,
Sergeant for Dade City Police Department,
in her individual capacity, et al.,

Defendants-Appellants,

RAY WHITE,
Detective for Dade City Police Department,
in his individual capaclity

Defendant-Counter-
Claimant-Appellant.

_____

No. 01-16126
_____

D. C. Docket No. 99-00070-CV-T-30B

JOHN WAYNE LUMLEY,

Plaintiff-Appellant,

versus

CITY OF DADE CITY FLORIDA, A Municipal Corporation,
PASCO COUNTY, FLORIDA, A Municipal Corporation,
LEE CANNON, Sheriff for Pasco County, in his
individual and official capacity,
PHILLIP THOMPSON, Chief of Police for Dade City
Police Department, in his individual and official
capacity,
MICHAEL WILKES, Lieutenant for the Dade City Police
Department, in his individual capacity, et. al.,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(April 10, 2003)**

Before TJOFLAT, WILSON and COWEN*, Circuit Judges.

TJOFLAT, Circuit Judge:

_____

* Honorable Robert E. Cowen, United States Circuit Judge of the Third Circuit, sitting by
designation.

2

In this civil rights action, brought under 42 U.S.C. § 1983, the plaintiff seeks money damages for the manner in which he was treated by law enforcement officers when they arrested him for attempted murder, armed robbery, and carjacking, and hospitalized him for the injuries he sustained while committing these crimes. The district court, on summary judgment, rejected the officers' defense of qualified immunity on the ground that their treatment of the plaintiff violated clearly established constitutional standards.[1] The officers now appeal. Concluding that the officers did not violate the plaintiffs' constitutional rights, we reverse, and direct the district court to grant them judgment.

I.[2]

On January 3, 1995, John Wayne Lumley, the plaintiff, entered a Winn Dixie store in Dade City, Florida, and shot a Wells Fargo guard from point blank range.[3] Lumley seized the bag of money in the guard's possession, fled the store,

---

[1] In the same order denying the defendants qualified immunity, the district court granted the defendants summary judgment on the plaintiff's Sixth Amendment right to the assistance-of-counsel claim. As indicated in the text infra, the plaintiff appeals that interlocutory ruling under 28 U.S.C. § 1292(b). We have consolidated that appeal with the defendants' appeal.

[2] Because we are reviewing the disposition of a motion for summary judgment, we consider the record in the light most favorable of the non-movant (here, the plaintiff), Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002), and recount the facts accordingly.

[3] The Wells Fargo guard was wearing a protective vest, and was not seriously injured.

3

and ran across the parking lot, exchanging gunfire with another Wells Fargo guard. Lumley eyed a woman getting into a pick up truck, pointed his gun at her and ordered her to give him the keys; she complied without resistance. As Lumley attempted to drive away in her truck, the Wells Fargo guard who had been shot inside the store, emerged from the store, and fired his revolver at the truck. A bullet went through the windshield and struck Lumley, entering the left side of his face and lodging in his right jaw. Undeterred, Lumley proceeded to ram the Wells Fargo armored truck, which was blocking his exit, and escape.

The Dade City Police Department investigated the crime, suspected that Lumley was the culprit, and obtained a warrant for his arrest. On January 10, 1995, the Sheriff of Appling County, Georgia received a tip that Lumley was staying at the home of his nephew in Baxley, Georgia, and, a short time later, Lumley was apprehended. Because Lumley appeared to be seriously injured – he still had the bullet in his jaw – the arresting officers took him to a local hospital. The emergency room physician gave Lumley medicine to alleviate his pain and to stem the infections developing in his wounds. The doctor informed the officers that he was not competent to determine what should be done about the bullet in Lumley's jaw, and that a qualified physician was not readily available. Because Lumley's medical condition appeared to have been stabilized, the officers took

him to the Appling County Jail to await extradition to Florida.

On learning of Lumley's apprehension, Lieutenant *Michael Wilkes* and Detective *Ray White* of the Dade City Police Department traveled to Georgia to interview Lumley.[4] They arrived at the Appling County Jail on January 11, at 10:00 a.m. After *Wilkes* read him his <u>Miranda</u> rights, Lumley asked to see a lawyer. *Wilkes* and *White* did not grant the request, but promptly left the jail. At 3:00 p.m. the same day, two Pasco County Sheriff's deputies arrived. Lumley waived extradition, and the deputies transported him to Florida, arriving in Pasco County around 8:00 p.m. Instead of taking him to the Pasco County Detention Center, however, the deputies – knowing that Lumley could not be accepted into the detention facility with gunshot wounds to the head[5] – delivered him to the East Pasco Medical Center (EPMC) for evaluation. The Sheriff's office contacted the EPMC prior to their arrival to advise it of Lumley's condition and request that a physician qualified to treat Lumley's wounds be on standby. Lumley was

---

[4] In this opinion, we italicize the names of the law enforcement officers who are appealing the district court's rejection of their qualified immunity defense. The names of the other individuals involved in Lumley's arrest and his custody and medical treatment at the East Pasco Medical Center appear in ordinary type because they were either not named as defendants or were dismissed from the case with prejudice on Lumley's motion.

[5] Pasco County's Rules of Department of Corrections, Chapter 33-8, provided that "detention facilities shall not admit an unconscious person or a person who appears to be seriously ill or injured. Any such person shall be afforded necessary medical attention prior to admission." This policy was in compliance with the American Corrections Association accreditation standards.

admitted to the EPMC at 8:42 p.m.

The Pasco County Sheriff's office regarded Lumley as "extremely dangerous." Twice he had been convicted of armed robbery,[6] and twice he had escaped from prison.[7] In addition, the Sheriff's office believed that Lumley had some accomplices who might try to effect his escape. The Sheriff's office therefore decided to restrain him while in the EPMC. Deputies strapped him to his hospital bed, guarded him round the clock, and prohibited all visitors,[8] including members of his family and lawyers from the Pasco County public defender's office. Deputies *James Toner* and Susan Anderson were the first to guard Lumley. They were replaced by twenty deputies, who worked eight-hour shifts in teams of two; the deputies included *Benjamin Cooper* and *Joseph Savino*.

Nurses attended to Lumley from the moment of his admission until he was seen at noon the next day, January 12, by Dr. Tew Sak, an otolaryngologist.[9] Dr.

---

[6] In addition to these convictions for armed robbery, Lumley had been convicted of several other crimes of violence.

[7] He escaped while serving his sentence for one of his armed robbery convictions; he escaped from a prison hospital where he was being treated for schizophrenia, which he had feigned.

[8] Pasco County's Corrections Bureau Procedure, Hospital Security, mandated each of these security measures when dealing with an dangerous felon who posed a high escape risk. These procedures were in compliance with the American Corrections Association accreditation standards.

[9] An otolaryngologist is an ears, nose, and throat specialist.

Sak examined Lumley and noted the following:

> A bullet entered the left cheek, jaw and jaw line area penetrating through the hard pallet causing fracture of the right zygoma and the bullet landed lateral to the fractured zygomatic bone on the right side. Mr. Lumley was having significant pain and discomfort on moving his mouth and eyelid due to the bullet location which was in close proximity to the masseter muscle . . . . [Mr. Lumley] was also noted to have a fracture of the right zygomatic bone which was only minimally displaced. It was not medically indicated to treat the fracture at the time . . . .

Dr. Sak believed that it was in Lumley's "best interest" to have the bullet removed. He told Lumley what Lumley's options were, and recommended that the bullet be removed.[10] Lumley consented to the surgery in writing.[11]

The surgery took place at 11:30 the next morning, January 13, and lasted approximately thirty minutes. Before Lumley entered the operating room, Buchanon notified *Wilkes* that Dr. Sak was going to remove the bullet. *Wilkes*, in

---

[10] The record does not indicate what Dr. Sak said would be the untoward consequences of leaving the bullet in Lumley's jaw. There is no dispute in the evidence, however, that Dr. Sak recommended the bullet's removal, thus creating the inference that, from a medical point of view, removing the bullet was advisable.

[11] Lumley signed a consent form presented to him by Nurse Sandra Buchanon (one of the defendants whom Lumley dismissed from the case). On deposition, Lumley said that he voluntarily signed the form. He did so because he was "scared;" he "thought [he] was dying." His testimony contradicted the allegation of his complaint – that he was coerced into signing the form. His testimony corroborated Buchanon's testimony on deposition. Buchanon testified that Dr. Sak told her that Lumley wanted to have the bullet removed, and asked her to have Lumley sign the consent form.

turn, asked Sergeant *Linda Register* to go to the EPMC and retrieve the bullet. After Dr. Sak removed it, a nurse handed it to *Register*. Following the surgery, Lumley was placed in a recovery room for about an hour, and then returned to his hospital room where he received post-operative care for two days. Dr. Sak and several nurses regularly checked on him, and at 2:30 p.m. on January 15, Dr. Sak authorized his release from the hospital. He was released to the custody of Pasco County Sheriff's deputies, who transported him to the Pasco County Detention Center. The following day, January 16, Lumley appeared before a judge, and a lawyer from the public defender's office was appointed to represent him.

Lumley subsequently stood trial on indictments issued by Pasco County and Middle District of Florida grand juries. A Pasco County jury convicted him on two counts of attempted first degree murder and two counts of armed robbery. A Middle District of Florida jury convicted him of carjacking, possession of ammunition by a convicted felon, and knowingly using and carrying a firearm during and in relation to a federal crime of violence. He is presently incarcerated in a federal prison.

II.

Lumley filed this lawsuit, seeking damages under 42 U.S.C. § 1983,[12] against the Pasco County Sheriff's Department, former sheriff *Lee Cannon* (who was the sheriff at the time of Lumley's arrest); current sheriff Bob White (who took office long after the events at issue); several sheriff's deputies; the City of Dade City; several officers in the Dade City Police Department; Dr. Sak; and Nurse Sandra Buchanon. As to the individual defendants, Lumley sued the current sheriff in his official capacity, the former sheriff in both his official and individual capacities, and the sheriff's deputies, the police officers, Dr. Sak, and Nurse Buchanon in their individual capacities.

Lumley's complaint, framed in four counts, is a rambling "shotgun" pleading.[13] As best we are able to discern, Lumley's claims are as follows: Count

---

[12] 42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

[13] The complaint we refer to in this opinion is Lumley's fourth amended complaint. As indicated in the text, it contains four counts. Each count incorporates by reference the allegations of the preceding counts and thus includes allegations that are irrelevant to the cause(s) of action the count ostensibly states. Count I contains 55 paragraphs; Count II includes Count I and five additional paragraphs, and so on. We have repeatedly condemned such pleading, see e.g., Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg, 305 F.3d 1293, 1295-97 (11th Cir. 2002), and suggest that, when faced with such pleading, the district court, acting on its own initiative, require a repleader.

9

I, brought against the City of Dade City, the Pasco County Sheriff's Department, and Sheriff Bob White, alleges that sheriff's deputies and Dade City police officers named as defendants deprived him of his right to access a lawyer, in violation of the Sixth Amendment, and infringed his "rights to privacy and due process" and his right to be free from "undue and excessive force and cruel and unusual punishment" by causing the bullet to be removed from his jaw and restraining his movement (by strapping him to his hospital bed), in violation of the Fourteenth Amendment. Additionally, Count I alleges that these defendants "denied proper medical attention for the injuries he had sustained, including conducting an operation . . . without instructing him on the need or dangers of the operation and then failing to repair his broken jaw and shattered cheekbone while performing the surgery to remove the bullet fragments."[14]

Count II, brought against *Wilkes*, *Register*, and *Ray White* (all Dade City police officers), incorporates Count I, and alleges that these officers strapped him

---

[14] Although Count I does not indicate the constitutional basis for the allegation quoted above, we assume that the basis is the substantive component of the Fourteenth Amendment's Due Process Clause. In addition to the foregoing, Count I alleges that Lumley was "harmed by the fact that confidential medical records were passed between Defendant EPMC employees and the Pasco County Sheriff's Department Defendants without the permission or consent of the Plaintiff." In rejecting the defendants' qualified immunity defense, the district court did not address the question of whether the conduct described in this allegation infringed a constitutional right. Neither the complaint nor Lumley's answer brief in this appeal identifies the constitutional provision such conduct purportedly implicated. We therefore disregard this allegation.

to a bed for five consecutive days, denied him access to a lawyer, family members, and the court, failed to inform him of the charges against him, ordered Dr. Sak to perform surgery without his consent, obtained the bullet from his jaw, and otherwise deprived him of "his rights, privileges, and immunities secured by the Sixth and Fourteenth Amendments." Count III, brought against six Pasco County sheriff's deputies (*Toner*, *Cooper, Savino*, David Roberts, *John Fairbanks*, and Don Davidson),[15] repeats the allegations of Count II.[16] Count IV, brought against all of the defendants, alleges that they conspired to infringe Lumley's constitutional rights as alleged in the preceding three counts.[17]

In answering the complaint, the individual defendants sued in their

---

[15] *Fairbanks* was the Sheriff's office "Captain of Corrections." His job was to oversee and ensure that Lumley was properly and safely secured while a patient at the EPMC. At no time, however, was he present at the EPMC while Lumley was there.

[16] Count III added the following allegations: that Lumley was "harmed by the fact that improper and suggestive means were used to extract identification from a witness which was subsequently used as a basis for an arrest and search warrant of [Lumley] or as legal authority for such violation of right to privacy," and that Lumley was "harmed by the fact that material facts were intentionally or recklessly misrepresented or omitted to a judge in order to obtain [his] arrest and to obtain a sample of [his] blood." In rejecting the defendants' qualified immunity defense, the district court did not address the question of whether the conduct described in these allegations infringed a constitutional right. Neither the complaint nor Lumley's answer brief in this appeal identifies the constitutional provision the conduct purportedly implicated. We therefore disregard these allegations.

[17] The complaint is ambiguous as to which defendant – with the exception of Dr. Sak – committed which act in derogation of Lumley's constitutional rights. The drafter of the complaint presumably included the Count IV "conspiracy" so as to make each defendant the agent of every other defendant and therefore responsible for every constitutional injury Lumley allegedly suffered.

11

individual capacities pled as an affirmative defense the defense of qualified immunity. After discovery closed, they filed motions for summary judgment based on that defense. The defendants also moved for summary judgment on Lumley's claims that they infringed his Sixth Amendment right to counsel by barring his access to an attorney while he was hospitalized.[18] Before the court ruled on their motions, Lumley voluntarily dismissed with prejudice several defendants, including Dr. Sak and Nurse Buchanon. Subsequently, in an order addressing the remaining defendants' motions, the court rejected their qualified immunity defense. At the same time, it granted the defendants summary judgment on Lumley's Sixth Amendment claims. These defendants now appeal the court's denial of qualified immunity under 28 U.S.C. § 1291.[19] Lumley simultaneously seeks interlocutory review of the court's decision on his Sixth Amendment claims; we will review that decision under 28 U.S.C. § 1292(b).

III.

---

[18] As indicated supra, Lumley's Sixth Amendment right-to-counsel claim appears in Count I and, via incorporation by reference, Counts II, III, and IV.

[19] This is an interlocutory appeal, in that the district court has not entertained a final judgment disposing of all claims against all defendants. We nonetheless have jurisdiction under 28 U.S.C. § 1291 to review the denial of the defense of qualified immunity. Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817, 86 L. Ed. 2d 411 (1985).

12

Qualified immunity protects government officials sued in their individual capacities as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Hope v. Pelzer, 536 U.S. 730, ___, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed.2d 396 (1982)). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation," Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002), by ensuring that only "the plainly incompetent or those who knowingly violate the law" are subjected to liability. Chesser v. Sparks, 248 F.3d 1117, 1122 (11th Cir. 2001) (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986)). "To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Vinyard, 311 F.3d at 1346 (quoting Lee, 284 F.3d at 1194 (internal quotation marks omitted)). If the defendants were not acting within their discretionary authority, they are ineligible for the benefit of qualified immunity. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). Here, it is clear that the defendants were acting – if they acted at all – in their discretionary capacities when they restrained and guarded Lumley or acted to

13

obtain the bullet from his body.

Once the defendants establish that they were acting within their discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate.  Vinyard, 311 F.3d at 1346.  The Supreme Court has set forth a two-part approach for the qualified immunity analysis.  "The threshold inquiry a court must undertake . . . is whether plaintiff's allegations, if true, establish a constitutional violation."  Id. (quoting Hope, 536 U.S. at ---, 122 S. Ct. at 2513).  If a court finds the violation of a constitutional right under the plaintiff's version of the facts, "the next, sequential step is to ask whether the right was clearly established."  Id. (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. E. 2d 272 (2001)).

Lumley contends that, for summary judgment purposes, the record establishes the following claims for relief.[20]  First, the appellants infringed his Sixth Amendment right to counsel when they refused to permit him to see a lawyer while he was a patient at the EPMC.[21]  Second, the appellants denied him substantive due process in violation of the Fourteenth Amendment in the manner

[20]  Although we use different language in expressing them, these are the claims as presented in the answer brief Lumley filed in this appeal.

[21]  The Sixth Amendment is applicable to the states through the Fourteenth Amendment. Gideon v. Wainwright, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963).

14

in which they restrained him to his hospital bed. Third, the appellants infringed the right of privacy guaranteed him by the Fourteenth Amendment when Dr. Sak removed the bullet from his jaw. Fourth, the appellants denied him substantive due process in violation of the Fourteenth Amendment when they failed to attend to his medical needs.

We consider the Sixth Amendment claims in the context of Lumley's appeal under 28 U.S.C. § 1292(b). We consider the remaining claims under 28 U.S.C. § 1291, as the Supreme Court has instructed in Hope v. Pelzer – by determining first whether the record establishes any of the claims and, if it does, by determining whether the constitutional right at issue was clearly established at the time of the acts complained of. We begin with Lumley's Sixth Amendment claims.

A.

The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. As the amendment states, the right to counsel is guaranteed in all "criminal prosecutions," which the Supreme Court has made clear do not commence until "at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing,

15

indictment, information, or arraignment." <u>Texas v. Cobb</u>, 532 U.S. 162, 167-68, 121 S. Ct. 1335, 1340, 149 L. Ed. 2d 321 (2001).[22]  In other words, the Sixth Amendment right to counsel ordinarily does not arise until there is a formal commitment by the government to prosecute; "[i]t is only at that time 'that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified.' " <u>United States v. Gouveia</u>, 467 U.S. 180, 189, 104 S. Ct. 2292, 2298, 81 L. Ed. 2d 146 (1984) (quoting <u>Kirby v. Illinois</u>, 406 U.S. 682, 689, 92 S. Ct. 1877, 1882, 32 L. Ed. 2d 411 (1967)).  Accordingly, "[t]he mere filing of a complaint and the issuance of a warrant for the [accused's] arrest," does not constitute a formal commitment by the government to commence a criminal prosecution for purposes of the Sixth Amendment.  <u>United States v. Langley</u>, 848 F.2d 152, 153 (11th Cir. 1988).

---

[22]  The right to counsel attaches at trial, <u>Gideon</u>, 372 U.S. at 335, 83 S. Ct. at 792, and at certain "critical" pretrial proceedings. <u>United States v. Grimes</u>, 142 F.3d 1342, 1348 (11th Cir. 1998) (quoting <u>Michigan v. Jackson</u>, 475 U.S. 625, 629-30, 106 S. Ct. 1404, 1407-08, 89 L. Ed. 2d 631 (1986)).  The precise contours of what constitutes the "critical" pretrial stages of a criminal prosecution are not certain, but the right to counsel is said to arise where "substantial rights of the accused may be affected." <u>Williams v. Turpin</u>, 87 F.3d 1204, 1209 (11th Cir. 1996) (quoting <u>Mempa v. Rhay</u>, 389 U.S. 128, 134, 88 S. Ct. 254, 256-57, 19 L. Ed. 2d 336) (1967)).  This essentially turns on whether "counsel's absence might derogate from the accused's right to a fair trial." <u>United States v. Hidalgo</u>, 7 F.3d 1566, 1569 (11th Cir. 1993) (quoting <u>United States v. Wade</u>, 388 U.S. 218, 226, 87 S. Ct. 1926, 1932, 18 L. Ed. 2d 1149 (1967)).  Applying this standard, the Supreme Court has held that an accused has the right to the assistance of counsel at a preliminary hearing, <u>White v. Maryland</u>, 373 U.S. 59, 60, 83 S. Ct. 1050, 1051, 10 L. Ed. 2d 193 (1963), and at some pretrial identification procedures. <u>United States v. Wade</u>, 388 U.S. 218, 236, 87 S. Ct. 1926, 1237, 18 L. E. 2d 1149 (1967).

The district court concluded, and Lumley concedes, that at the time he was held at the EPMC, formal criminal proceedings had not been initiated. Given the precedent cited above, this would seem to foreclose his right to counsel claim. Nonetheless, he contends that his right to counsel attached because he was under arrest <u>and</u> he was the sole suspect in the case. He draws support for his position from one Supreme Court decision, <u>Escobedo v. Illinois</u>, 378 U.S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964). In that case, the petitioner, Escobedo, was arrested for the murder of his brother-in-law and taken to the police station. There, the police refused to let him speak to his lawyer and took him to the "Homicide Bureau" where detectives questioned him for several hours; they did so despite his repeated requests to see his lawyer and while his lawyer was at the Homicide Bureau asking to see him. The Illinois courts denied Escobedo's motion to suppress the statements he gave to the detectives. On review, the Supreme Court framed the question: "whether . . . the refusal by the police to honor petitioner's request to consult with his lawyer during the course of an interrogation constitutes the denial of the Assistance of Counsel in violation of the Sixth Amendment . . . as made obligatory upon the States by the Fourteenth Amendment." <u>Id.</u> at 479, 84 S. Ct. at 1759 (internal quotation marks omitted).

Putting aside the fact that subsequent Supreme Court decisions have

indicated that the constitutional right at stake in <u>Escobedo</u> was the petitioner's Fifth Amendment right against self-incrimination, <u>see</u> <u>Kirby</u>, 406 U.S. at 689, 92 S. Ct. at 1882 (stating that <u>Escobedo</u>'s " 'prime purpose' . . . was not to vindicate the constitutional right to counsel as such, but, like <u>Miranda</u>, 'to guarantee full effectuation of the privilege against self-incrimination' ") (quoting <u>Johnson v. New Jersey</u>, 384 U.S. 719, 729, 86 S. Ct. 1772, 1779, 16 L. Ed. 2d 882 (1965)), <u>Escobedo</u> is factually inapposite.[23]  Here, there was no interrogation; neither the Pasco County sheriff's deputies nor the Dade City police officers asked Lumley anything about the offenses for which he had been arrested.  All we have in this case is an arrest.  Nothing had occurred to trigger Lumley's Sixth Amendment right to counsel.

B.

Having disposed of Lumley's appeal, we turn to the question of whether the appellants are entitled to qualified immunity on Lumley's remaining claims.  As required by <u>Hope v. Pelzer</u>, we first consider whether the record establishes any of those claims.

---

[23] We also note that the Supreme Court has limited the holding of <u>Escobedo</u> to its own facts.  <u>See</u> <u>Kirby</u>, 406 U.S. at 689, 92 S. Ct. at 1882.

18

1.

Lumley contends that, in violation of the Fourteenth Amendment, the appellants denied him "substantive due process" by using excessive force to strap him to his hospital bed while he was at the EPMC. He asserts, moreover, that this constituted "cruel and unusual punishment." "Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause, instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners." Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996). "As a general rule, to prevail on a claim of a substantive due-process violation, a plaintiff must prove that a defendant's conduct 'shocks the conscience.' " Nix v. Franklin County School Dist., 311 F.3d 1373, 1375 (11th Cir. 2002) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 836, 846-47, 118 S. Ct. 1708, 1717, 140 L. Ed. 2d 1043 (1998)). "A showing of mere negligence is insufficient to make out a constitutional due-process claim: '[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.' " Id. at 1375-76 (quoting Lewis, 523 U.S. at 849, 118 S. Ct. at 1708). In this case, we could hardly say that strapping Lumley to his hospital bed "shocks the conscience." He was a dangerous criminal with a violent record. He presented a

19

significant risk of flight, having escaped from prison settings on two occasions. As he testified on deposition, he should have been considered a dangerous person and an escape risk. His substantive due process claim accordingly fails.

2.

Lumley next complains that the appellants violated his privacy expectations under the Fourteenth Amendment when they had Dr. Sak remove the bullet from his face. The record is clear that, contrary to the allegations of Lumley's complaint, Dr. Sak acted alone. As noted supra, Lumley has dismissed his claims against Dr. Sak with prejudice. The legal affect of such dismissal is that Dr. Sak did not infringe any of Lumley's constitutional rights. If that is so, it could hardly be said that the appellants, who took no part in removing the bullet, are vicariously liable – under Lumley's conspiracy theory, in which the individual defendants conspired with one another to violate the constitution – for the doctor's conduct. The appellants are consequently entitled to qualified immunity on this claim.

3.

Lumley's final claim is that the appellants denied him substantive due process in violation of the Fourteenth Amendment when they failed to attend to his medical needs. Specifically, Lumley contends that Dr. Sak failed to treat the

"fracture of the right zygomatic bone[, i.e., the right cheek bone,]" which the Doctor observed on examination. We dispose of this claim, and hold that the appellants are entitled to qualified immunity, under the same analysis we used to dispose of Lumley's previous claim regarding the removal of the bullet.

IV.

For the foregoing reasons, we AFFIRM the district court's decision granting the appellants summary judgment on Lumley's Sixth Amendment claims, and we REVERSE the court's decisions denying the appellants qualified immunity. On receipt of our mandate, the court shall enter an order granting the appellants summary judgment on Lumley's claims against them in their individual capacities.

SO ORDERED.