In re OAKWOOD HOMES CORPORATION, et al., Debtors.

OHC Liquidation Trust, Plaintiff,

v.

Credit Suisse First Boston, a Swiss banking corporation, Credit Suisse First Boston LLC, a Delaware limited liability corporation, Credit Suisse First Boston, Inc., Credit Suisse First Boston (U.S.A.), Inc., a Delaware corporation and a wholly owned subsidiary of Credit Suisse First Boston, Inc., the subsidiaries and affiliates of each, and Does 1 through 100, Defendants.

Bankruptcy No. 02–13396 (PJW).
Adversary No. 04–57060 (PJW).

United States Bankruptcy Court, D. Delaware.

March 31, 2006.

Mark D. Collins, Russell C. Silberglied, Cynthia L. Collins, Richards, Layton & Finger, P.A., Wilmington, DE, R. Paul Wickes, Mary K. Warren, Michael J. Osnato, Jr., J. Justin Williamson, New York, NY, for Credit Suisse First Boston.

Marla Rosoff Eskin, Kathleen J. Campbell, Campbell & Levine, LLC, Wilmington, DE, Tony Castanares, Stephan M. Ray, Pamala J. King, Margreta M. Sundelin, Stutman, Treister & Glatt P.C., Los Angeles, CA, Special Counsel for OHC Liquidation Trust.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

This opinion is with respect to the defendants Credit Suisse First Boston's motion to dismiss and motion to compel. Part I discusses the motion to dismiss, while Part II addresses the motion to compel. For the reasons stated below, the Court will deny the motion to dismiss (except as to Count X, which the Court will leave pending), but will grant the motion to compel.

## Part I—MOTION TO DISMISS

This part of the opinion is with respect to Credit Suisse First Boston's motion (Adv.Doc. # 21) seeking to dismiss the adversary proceeding commenced against it by the OHC Liquidating Trust. For the reasons set forth below, the motion will be denied as to Counts I through III and V through IX. With respect to Count X, the Court will treat the motion as pending.

## BACKGROUND

The facts, as summarized in this section, are drawn from the complaint, which at this stage must be accepted as true. For purposes of this motion, the Court will adopt the complaint's terminology. As such, the Court will refer to the four defendants as the defendants or "CSFB" and will refer to the Oakwood Homes Corporation (the "Debtor") and all of its debtor subsidiaries and affiliates as "OHC" or the "Debtors."

Since 1947, the Debtors had provided modest or affordably priced housing to their customers (Adv.Doc. # 1, ¶ 12). More specifically, the Debtors designed, manufactured and marketed manufactured and modular homes (Adv.Doc. # 1, ¶ 5). The Debtors also provided financing to their customers in the form of retail sale installment contracts (Adv.Doc. # 1, ¶ 5).

Since at least 1994, CSFB was the Debtors' securities underwriter. (Adv.Doc. # 1, ¶ 11). Over the years in this capacity, CSFB would come to underwrite more than $7.5 billion in Oakwood Companies (including OHC) securities (Adv.Doc. # 1, ¶ 11).

In 1998, the manufactured and modular home industry hit an all-time high (Adv. Doc. # 1, ¶ 18). But by 1999, the industry was experiencing challenging market conditions (Adv.Doc. # 1, ¶ 18). The Debtors' revenue declined due to weakness in both wholesale and retail sales (Adv.Doc. # 1, ¶ 18). As a result, the Debtors were insolvent or were within the vicinity of insolvency since at least 2000 (Adv.Doc. # 1, ¶ 11). Unsurprisingly, the Debtors also faced a liquidity crunch during this period (Adv.Doc. # 1, ¶ 18).

Liquidity played a key role in the Debtors' ability to offer their customers mortgage financing on the retail installment sales contracts (Adv.Doc. # 1, ¶ 14). To obtain the funds necessary to provide their customers with financing, the Debtors primarily relied on a two-step, asset-backed securitization process (Adv.Doc. # 1, ¶ 14). The process was conceived, arranged, controlled, implemented, and underwritten by CSFB, who as early as 2000 was also serving as the Debtors' de facto restructuring and financial advisor (Adv.Doc. # 1, ¶ 11, 14).

As the first step in the securitization process, an OHC subsidiary would obtain cash by using the retail installment sales contracts as collateral to borrow against the warehouse facility (Adv.Doc. # 1, ¶ 14). Once a sufficient amount of installment contracts was accumulated, the contracts would be bundled and transferred to private and institutional investors through a series of complex transactions (Adv.Doc. # 1, ¶ 14).

The investors would be paid from the principal and interest payments of the initial obligors on the underlying installment contracts (Adv.Doc. # 1, ¶ 15). However, as economic conditions weakened, default rates rose. (Adv.Doc. # 1, ¶ 15). To induce investors to purchase the securities despite the high default rates, OHC began to guarantee certain shortfalls in the payments on the installment contracts (Adv. Doc. # 1, ¶ 15, 16, 20).

In addition, with the encouragement of CSFB, the Debtors ramped up the use of the Loan Assumption Program (hereinaf-

ter, the "LAP") (Adv.Doc. # 1, ¶ 21). Under the LAP, the original obligor would find a third-party to purchase the home and assume the remaining payments on the installment contract (Adv.Doc. # 1, ¶ 21). Prior to 2000, the Debtors infrequently used a distant variant of the LAP only in cases where the existing obligor found a third-party with satisfactory credit (Adv.Doc. # 1, ¶ 21). The LAP, however, was not so picky (Adv.Doc. # 1, ¶ 21).

From 2000 forward, CSFB encouraged the Debtors' use of the LAP to subsidize the increasing defaults (Adv.Doc. # 1, ¶ 22). As a result of CSFB's inducements, the LAP morphed into a grossly overused program that became not only unsustainable but also resulted in the expenditure of a significant amount of the Debtors' cash that it could otherwise have used in its operations (Adv.Doc. # 1, ¶ 21). Despite the fact that CSFB had insider information and knew that the LAP was unsustainable, (Adv.Doc. # 1, ¶ 21, 25), it still induced the Debtors to use and expand the LAP (Adv.Doc. # 1, ¶ 19, 37). According to the complaint, CSFB did this for the purpose of enriching itself, through exorbitant fees and other remuneration, by prolonging the life of the Debtors' securitization program that not only deepened the insolvency of the Debtors, but eventually drove them into bankruptcy (Adv.Doc. # 1, ¶ 19, 37).

In February 2001, CSFB became a secured lender to the Oakwood Companies pursuant to what the plaintiff refers to as the $200 million "CSFB Warehouse Facility" (Adv.Doc. # 1, ¶ 11). In connection with its lending, CSFB demanded and received warrants to purchase just under 20% of OHC's common stock (Adv.Doc. # 1, ¶ 11). Thus, as of 2001, CSFB was not only the Debtors' underwriter, financial advisor and secured lender but also a powerful warrant holder (Adv.Doc. # 1, ¶ 11).

On August 19, 2002, CSFB formalized its advisory role pursuant to a letter agreement and became the Debtors' exclusive restructuring and financial advisor (Adv. Doc. # 1, ¶ 11).

On November 15, 2002, the Debtor and its related entities filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") (Doc. # 1). On March 31, 2004, this Court confirmed the Debtors' "Second Amended Joint Consolidated Plan of Reorganization of Oakwood Homes Corporation and Its Affiliated Debtors and Debtors in Possession" (the "Plan") (Doc. # 3937). The Plan became effective as to all but one of the Debtors on April 13, 2004 (Adv.Doc. # 1, ¶ 7). The Plan became effective as to the remaining Debtor on April 27, 2004 (Adv. Doc. # 1, ¶ 7).

Pursuant to Section 6.3(b) of the Plan, Paragraph 40 of the Confirmation Order, and the Liquidating Trust Agreement, the OHC Liquidating Trust ("Liquidating Trust" or the plaintiff) was deemed established as of the Plan's effective date (Doc. # 3937, ¶ 40; Doc. # 3503, § 6.3(b)). The Liquidating Trust is vested with the power to prosecute, compromise, or settle adversary proceedings (Doc. # 3503, § 6.3(b)).

On November 13, 2004, the Liquidating Trust instituted this proceeding by objecting to CSFB's proofs of claim and asserting numerous counterclaims (Adv.Doc. # 1). On May 6, 2005, the defendants filed the instant motion seeking to dismiss Counts I through III and V through X of the complaint (Adv.Doc. # 21).

## DISCUSSION

A motion to dismiss for failure to state a claim upon which relief can be granted serves to test the sufficiency of the complaint. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). When deciding such a

motion, a court accepts as true all allegations in the complaint and draws all reasonable inferences from it which the court considers in a light most favorable to the plaintiff. *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989). A court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Maio v. Aetna, Inc.,* 221 F.3d 472, 482 (3d. Cir.2000) (quotations and citation omitted).

### I. First Counterclaim—Breach of Fiduciary Duty

 The plaintiff's first claim alleges a breach of fiduciary duty. The defendants counter that no fiduciary duty existed as a matter of law; therefore, no such duty could be breached. To support this conclusion, the defendants state the uncontroversial principle that "the usual relationship of bank and customer is that of debtor and creditor" (Adv.Doc. #22, p. 29). This does little to advance the defendants' argument. Unquestionably, the relationship between borrower and bank will not create a fiduciary relationship by itself. However, a fiduciary relationship will exist anytime one person obligates himself or herself to act for or to give advice for the benefit of the other. RESTATEMENT (SECOND) OF TORTS § 874, cmt. a (1979). In other words, fiduciary liability is not dependent solely on the contract; rather, liability rests on the nature of the relationship. *Id.* cmt. b. In this case, the complaint sufficiently alleges a fiduciary relationship.

In coming to this conclusion, the Court is guided by a most recent decision of the New York Court of Appeals.[1] In *EBC I, Inc. v. Goldman Sachs & Co.,* 5 N.Y.3d 11, 799 N.Y.S.2d 170, 832 N.E.2d 26 (N.Y. 2005), New York's highest court determined that "[t]o the extent that underwriters function, among other things, as expert advisors to their clients on market conditions, a fiduciary duty may exist." *EBC I,* 799 N.Y.S.2d 170, 832 N.E.2d at 32. The court reasoned as follows:

> It may well be true that the underwriting contract, in which Goldman Sachs agreed to buy shares and resell them, did not in itself create any fiduciary duty. However, a cause of action for breach of fiduciary duty may survive, for pleading purposes, where the complaining party sets forth allegations that, apart from the terms of the contract, the underwriter and issuer created a relationship of higher trust than would arise from the underwriting agreement alone. Here, the complaint alleges an advisory relationship that was independent of the underwriting agreement. Specifically, plaintiff alleges eToys was induced to and did repose confidence in Goldman Sachs's knowledge and expertise to advise it as to a fair IPO price and engage in honest dealings with eToy's best interest in mind. Essentially, according to the complaint, eToys hired Goldman Sachs to give it advice for the benefit of the company, and Goldman Sachs thereby had a fiduciary obligation to disclose any conflict of interest concerning the pricing of the IPO.

> \* \* \* \* \* \*

> This holding is not at odds with the general rule that fiduciary obligations do not exist between commercial parties operating at arms' length—even sophisti-

---

1. The defendants assert that New York law governs Count I.

cated counseled parties—and we intend no damage to that principle. Under the complaint here, however, the parties are alleged to have created their own relationship of higher trust beyond that which arises from the underwriting agreement alone, which required Goldman Sachs to deal honestly with eToys and disclose its conflict of interest—the alleged profit-sharing arrangement with prospective investors in the IPO.

*Id.* at 31–33; *see LaSala v. Needham & Co., Inc.,* 399 F.Supp.2d 466, 475, n. 68 (S.D.N.Y.2005) (noting in dictum a similar result); *Breakaway Solutions, Inc. v. Morgan Stanley & Co.,* No. 19522, 2005 WL 3488497, at *3, 2005 Del. Ch. LEXIS 200, at *11 (Del. Ch. Dec. 8, 2005) (following *EBC I* and interpreting it to impose both a duty to disclose and a separate duty to deal honestly).

In this case, the defendants were not only the Debtors' underwriters, but also the Debtors' financial and restructuring advisors, the lead lenders on the warehouse facility, and powerful warrant holders (Adv.Doc. # 1, ¶ 11). The complaint alleges, among other things, that the defendants had such influence over the Debtors that they exercised de facto control (Adv.Doc. # 1, ¶ 31). This control and influence arose from more than just the Debtors' contractual relationships with the defendants (Adv.Doc. # 1, ¶ 11, 14). Rather, the defendants' influence began early, even before entering into formal contracts, and grew over time (Adv.Doc. # 1, ¶ 31). Through the years, this multifaceted relationship placed the defendants in a position

of higher trust. This position of higher trust obligated the defendants to act in the best interests of the Debtors. *See EBC I,* 799 N.Y.S.2d 170, 832 N.E.2d at 31–33. But, according to the complaint, the defendants abandoned this obligation, and engaged in a self-serving campaign to extract unnecessary fees (Adv.Doc. # 1, ¶ 19, 37).

As such, the complaint alleges facts that the defendants abused their trusted positions in the "inner-circle" by intentionally guiding the Debtors down the path to financial ruin. If the defendants so acted, then they failed to deal honestly with the Debtors and instead chose purposefully to mislead the Debtors in order to loot the corporate coffers. Thus, the defendants' motion to dismiss Count I is denied.[2]

## II. Second Counterclaim—Negligence

Count II of the complaint sounds in negligence. The defendants seek to dismiss the claim on three grounds: 1) the exculpatory clause of the Financial Advisory Agreement relieves CSFB of damages resulting from ordinary negligence; 2) the negligence count does not allege an obligation independent of the breach of contract claim; and, 3) economic loss is not recoverable under a theory of negligence. None of these arguments warrant dismissal.

First, the defendants contend that an exculpatory clause in the Financial Advisory Agreement bars OHC's recovery. That clause relieves the defendants of liability to OHC "for or in connection with advice or services rendered or to be ren-

---

**2.** The Court notes that if contractual parties "do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them." *Northeast Gen. Corp. v. Wellington Adver.,* 82 N.Y.2d 158, 604 N.Y.S.2d 1, 624 N.E.2d 129, 131 (N.Y.1993). Despite this, fiduciary "lia-

bility is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation." RESTATEMENT (SECOND) OF TORTS § 874, cmt. b (1979). As such, this Court cannot merely ignore the factual allegations of the complaint.

dered ... except ... [those] determined by a judgment ... to have resulted solely from ... gross negligence or willful misconduct in connection with any such advice, actions, inactions or services" (Adv. Doc. # 22, Exh. G, Sched. I). By its terms, the exculpatory clause only relieves the defendants of ordinary negligence. As discussed in greater detail in Count X infra, an inference may be drawn from the complaint that the defendants' conduct rose to a level far above ordinary negligence. Therefore, the Court cannot grant dismissal based on the exculpatory clause.

■ Second, the defendants assert that the plaintiff's breach of contract claim prohibits it from succeeding on its claim of negligence. To support this, the defendants rely on four decisions applying New York law. None of these cases supports the defendants' position; to the contrary, each decision supports denying the defendants' motion.

■■ At the outset, the defendants begin by quoting *Chase Manhattan Bank, N.A. v. Remington Prods., Inc.,* 865 F.Supp. 194, 200 (S.D.N.Y.1994) *aff'd* 71 F.3d 407 (2d Cir.1995): "New York does not recognize a cause of action for negligent performance of a contract." However, the language immediately preceding the quoted language is relevant: "Chase correctly notes and the defendants do not contest, *with certain exceptions not relevant here,* that New York does not recognize a cause of action for negligent performance of a contract." *Id.* (emphasis added). The exceptions, not relevant in that case, are relevant in the instant matter. Specifically, a plaintiff may properly bring a claim of negligence where a "legal duty independent of the ... contract itself has been violated." *TD Waterhouse Inv. Servs. v. Integrated Funds Servs., Inc.,* No. 01 Civ. 8986, 2003 WL 42013, at *12, 2003 U.S. Dist. LEXIS 70, at *35

(S.D.N.Y. Jan. 6, 2003) *rev'd in part on unrelated grounds* 85 Fed Appx. 779 (2d Cir.2004). Here, the complaint sufficiently alleges facts necessary to support a finding of a separate legal duty (Adv. Doc # 1, ¶ 11).

Thus, under the weight of the authority relied on in the defendants' brief, the plaintiff's claim of negligence cannot be dismissed at this stage of the case. *See id.; Clark–Fitzpatrick, Inc. v. Long Island R.R. Company,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190, 193 (N.Y. 1987)("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated."); *Asian Vegetable Research & Dev. Ctr. v. Inst. Of Int'l Educ.,* 944 F.Supp. 1169, 1180 (S.D.N.Y.1996) ("Where a policy concern dictates the existence of an independent legal duty—such as where the defendant is a fiduciary, or a professional—such a legal duty may be imposed by law as an incident to the parties' relationship, and is not dependent on the parties' contractual relationship.").

■ Third, the defendants argue that "economic loss is not recoverable under a theory of negligence" (Adv.Doc. # 22, p. 34) (*quoting AT & T v. New York City Human Res. Admin.,* 833 F.Supp. 962, 982 (S.D.N.Y.1993)). Again, the defendants overstate the law by quoting the general rule without noting the applicable exceptions. Two such exceptions are relevant here: "The first exception, broadly stated, is that a party may recover purely economic loss damages in a tort malpractice action when the underlying contract is for the rendering of professional services .... The second exception is where a party is seeking to recover economic loss damages on a theory of negligent performance of a contract for services." *Niagra Mohawk Power Corp. v. Stone & Webster Eng'g*

*Corp.*, No. 88–CIV–819, 1992 WL 121726, at *23, 1992 U.S. Dist. LEXIS 7721, at *79–80 (N.D.N.Y. May 23, 1992); *see also AT & T*, 833 F.Supp. at 983 (recognizing an exception to the economic loss doctrine for service contracts).

■ Here, the contracts are based on the defendants' performance of various services, including professional services. The plaintiff alleges that the defendants negligently performed these services and breached their professional and fiduciary duties. Accordingly, the Court will deny the defendants' motion to dismiss Count II.

### III. Third Counterclaim—Unjust Enrichment

■ Count III of the complaint alleges unjust enrichment. To state a viable claim for unjust enrichment, the plaintiff must allege "the defendant was enriched at the plaintiff's expense and that the circumstances are such that equity and good conscience require that the defendant make restitution." *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 17 F.Supp.2d 275, 311 (S.D.N.Y.1998). "Unjust enrichment is a quasi-contractual remedy, so that such a claim is ordinarily unavailable when a valid and enforceable written contract governing the same subject matter exists." *Id.* This is so because a quasi-contract "is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment." *Clark–Fitzpatrick*, 521 N.Y.S.2d 653, 516 N.E.2d at 193. Put differently, "[i]n the case of actual contracts the agreement defines the duty, while in the case of quasi-contracts the duty defines the contract." 66 AM. JUR.2d RESTITUTION AND IMPLIED CONTRACTS § 6.

■ In this case, Count III incorporates by reference paragraphs 1 through 54. Certainly, express contracts cover some of the complained of activity. Nevertheless, the plaintiff alleges that the contracts fail to cover all such activity. Thus, to the extent the alleged unjust enrichment deals with matters not covered by an express agreement, the motion to dismiss Count III is denied.

### IV. Fourth Counterclaim—Equitable Subordination

Count IV of the complaint seeks equitable subordination. The defendants have not moved to dismiss Count IV.

### V. Fifth Counterclaim—Preferential Transfers

■ Pursuant to Bankruptcy Code § 547, Count V of the complaint seeks to avoid and recover certain preferential transfers. The defendants seek to have this Count dismissed on the grounds that it fails to satisfy the notice pleading requirements of Federal Rule of Civil Procedure 8. To satisfy Rule 8(a), made applicable by Federal Rule of Bankruptcy Procedure 7008, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). This Rule does not require the pleader to "set out in detail the facts upon which he bases his claim." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Rather, Rule 8(a) only requires that the complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.*

On several occasions, this Court has found that a complaint alleging a preferential transfer must contain certain information to survive a motion to dismiss: "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii)

name of transferee and (iv) the amount of the transfer." *TWA Inc. Post Confirmation Estate v. Marsh USA Inc. (In re TWA Inc. Post Confirmation Estate)*, 305 B.R. 228, 232 (Bankr.D.Del.2004); *Valley Media v. Borders (In re Valley Media)*, 288 B.R. 189, 192 (Bankr.D.Del.2003); *Posman v. Bankers Trust Co. (In re Lomas Fin. Corp.)*, Adv. Pro. No. 97–245, 1999 WL 33742299, at *2 (Bankr.D.Del. July 28, 1999). Although in *TWA, Valley Media,* and *Posman* this Court found the complaints lacking, the plaintiffs were nonetheless granted leave to file an amendment. Unlike the above referenced cases, the plaintiff in this matter need not file an amendment because the complaint provides the defendants with "fair notice." *Conley,* 355 U.S. at 47, 78 S.Ct. 99.

The defendants resist this conclusion with two assertions. First, the defendants argue that the complaint fails to detail the nature of the antecedent debt. Second, the defendants contend that the complaint does not sufficiently identify the transferors. Despite the defendants' contentions, I cannot agree that the complaint fails to provide the defendants with fair notice.

In this Court's view, the complaint sufficiently details the nature of the antecedent debt. The defendants cannot challenge the fact that the complaint provides exact dates, precise dollar amounts, and in some cases check numbers for each of the transfers (Adv.Doc. # 1, ¶¶ 41, 42). The complaint also details the relationship between the parties and states that many of the transfers arose out of the Loan Assumption Program (LAP) (Adv.Doc. # 1, ¶¶ 41, 42). In addition, the complaint sets out the various relationships between the Debtors and the defendants (Adv.Doc. # 1, ¶ 11).

However, the defendants counter that such information fails sufficiently to correlate the antecedent debt with each alleged transfer. The specificity that the defendants would demand goes far beyond the requirements of notice pleading. In *Valley Media,* this Court rejected the argument that a "complaint should also prove: (1) how Defendant is considered a creditor; (2) how an interest in the property was transferred to the Defendant; (3) that Plaintiff owed Defendant an antecedent debt; and (4) how the transfers enable Defendant to receive more than it would have in a Chapter 7 liquidation." *Valley Media,* 288 B.R. at 193. This Court went on to state that such a "view of complaint pleading ... would require detailing all relevant facts." *Id.* Rule 8(a) does not contemplate such specificity.

Likewise, the defendants' assertion that this Court should dismiss the complaint because it fails to articulate the transferors with particularity must fail. The complaint identifies the Oakwood Companies as the transferors. The Oakwood Companies, as defined by the complaint, include the Debtor and all of its subsidiaries and affiliates. As the defendants correctly state, the Oakwood Companies include certain non-debtor subsidiaries and affiliates. Because not all transferors are Debtor entities, the defendants seek to dismiss the preference action.

Although the complaint fails precisely to identify the transferors' names, it gives fair notice as to their identities. This is all that is required under Rule 8(a). Further, this Court will infer, as the plaintiff suggests, that the Oakwood Companies operated as a unit with little to no distinction between those that were Debtors and those that avoided bankruptcy. Also, the Court will infer that some of the transferors were the alter egos of some of the Debtors. In addition, the complaint creates the inference that these transfers were either made directly by a Debtor entity or were made from property in

which the Debtors had an interest (Adv. Doc. # 1, ¶¶ 41, 42). In other words, the Court will permit the plaintiffs to pursue these details in discovery. At this early stage, such "significant factual detail is not required." *Valley Media,* 288 B.R. at 192.

This holding is in accord with this Court's prior decisions in *TWA, Valley Media,* and *Posman.* As recognized previously, the rule articulated in those decisions is subject to the facts of the particular case. For example, in *TWA* this Court recognized that certain "fact situation[s] . . . warrant a relaxation of the rule as . . . articulated [in *Valley Media* and *Posman*]." *TWA,* 305 B.R. at 234. Where a relaxation of the rule is warranted, the plaintiff "will be entitled to pursue these details in discovery." *Id.* This Court believes that the facts set out in the complaint fairly place the defendants on notice. As such, the defendants' motion to dismiss is denied with respect to Count V.

*VI. Sixth Counterclaim—Preferential Transfers To An Insider*

█ Count VI of the complaint seeks to avoid and recover certain preferential transfers to insiders. Because the discussion of Count V applies to Count VI, a separate analysis is not warranted-with one exception.

Count VI alleges that the defendants are insiders of the Debtors. As insiders, the defendants would be subjected to a one year reachback period rather than the typical 90 days. 11 U.S.C. § 547(b)(4)(B). If the longer reachback applies, the plaintiff could potentially avoid and recover an additional $429,034,268.88 (Adv.Doc. # 1, ¶¶ 41, 42). The defendants fight this result and assert that they are not insiders as a matter of law.

With respect to a corporation, section 101(31)(B) of the Bankruptcy Code contains a nonexclusive list of insiders:

(31) The term "insider" includes—

\* \* \* \* \* \*

(B) if the debtor is a corporation—

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer or person in control of the debtor . . . .

In addition, subsections 101(E) and (F) provide that an insider also includes an affiliate and a managing agent of the debtor. Courts refer to the enumerated insiders in section 101(B), (E) and (F) as statutory insiders. *Hirsch v. Va. Tarricone (In re A. Tarricone, Inc.),* 286 B.R. 256, 262 (Bankr.S.D.N.Y.2002). Those transferees not listed, who nonetheless are determined to be insiders, are referred to as nonstatutory insiders. *Id.*

█ In determining whether a transferee qualifies as a non-statutory insider, courts generally rely on the legislative history:

[a]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.

S. REP. No. 95–989, 1978 WL 8531, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5810. From this, courts have applied insider status "flexibly to include a broad range of parties who have a close relationship with the debtor." *In re Locke Mill Partners,* 178 B.R. 697, 702 (Bankr. M.D.N.C.1995). In doing so, courts have focused on the closeness between the transferee and the debtor, the degree of control or influence the transferee exerts over the debtor, and whether the transac-

tions were conducted at arm's length. *See, e.g., In re Premiere Network Servs., Inc.,* 333 B.R. 126, 129 (Bankr.N.D.Tex.2005); *Hirsch,* 286 B.R. at 262. At times, these three inquiries blend into one another.

In this case, the plaintiff states that the defendants are insiders because they constitute "a person in control of the debtor," an affiliate, and a "managing agent of the debtor." The plaintiff also suggests that the defendants could qualify as non-statutory insiders. The defendants disagree and seek to dismiss.

In considering a motion to dismiss, this court is required to "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). The complaint alleges a longstanding multifaceted relationship that enabled the defendants to dominate and control the Debtors. Contrary to the defendants' assertions, the complaint states more than mere conclusions, it alleges an adequate factual basis for these conclusions.

■ As such, a determination of insider status must await further discovery. Such an inquiry "is fact-intensive and can be made only on a case-by-case basis." *Stanziale v. Pepper Hamilton, LLP, (In re Student Fin. Corp.),* 335 B.R. 539, 547 (D.Del.2005). Accordingly, the defendants motion to dismiss Count VI is denied.[3]

## VII. Seventh Counterclaim— § 548 Fraudulent Transfers

■ Count VII seeks to avoid and recover fraudulent transfers under § 548 of the Bankruptcy Code. The defendants attack Count VII on two grounds. First, the defendants reassert that the complaint fails to identify the transferors with specificity. Second, the defendants claim that the complaint aught to provide more detail regarding the allegation that "no reasonably equivalent value" was received in exchange for the transfers. The defendants' first contention was addressed in Count V and rejected. No further discussion of that argument is necessary.

With respect to the defendants' second contention, the complaint similarly meets

---

**3.** Although the motion to dismiss Count VI is denied, it is not clear to this Court how the defendants could be construed as affiliates of the Debtors. The complaint states that the defendants held warrants that, if exercised, would provide the defendants with *"just under 20% of OHC's common stock"* (Adv. Doc # 1, ¶¶ 30, 31) (emphasis added). Further, the plaintiff's brief represents that "had it been exercised, CSFB would have been the largest shareholder of OHC with approximately 17% of the outstanding stock" (Adv. Doc. # 38, p. 18, n. 28).

The definition of affiliate does not include an entity holding warrants for 17% of the outstanding stock:

(2) The term "affiliate" means—
(A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—

(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote
. . . .

11 U.S.C. § 101(2). Aside from 17% being less than 20%, the plaintiff fails to cite any authority that supports the view that warrants constitute "outstanding voting securities" under the Bankruptcy Code. At least some authority to the contrary exists. *In re Tex. Equip. Co.,* No. 01–50829, 2004 Bankr.LEXIS 187, at *9 (N.D.Tex. Feb. 25, 2004) ("the court cannot conclude that the ownership of stock options constitutes 'control' of outstanding shares of stock.").

However, this is not to say that the warrants are irrelevant. To the contrary, the warrants are one of many facts relevant in the overall analysis of whether the defendants qualify as non-statutory insiders.

the required standard. The complaint identifies the transfers at issue and alleges that the Debtors received less than reasonably equivalent value for such transfers. As such, dismissal is only appropriate if no set of facts would entitle the plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

■ Here, facts exist which, if proved, would allow the plaintiff to prevail. For example, the "quality of professional services is within the scope of a fraudulent conveyance action." *BCPM Liquidating LLC v. PricewaterhouseCoopers LLP (In re BCP Mgmt.)*, 320 B.R. 265, 280 (Bankr. D.Del.2005). Therefore, to the extent the defendants provided inadequate professional services, this could serve as a basis for recovery. *Id.* In any event, the complaint states that the Debtors did not receive reasonably equivalent value in return for their transfers. If the defendants disagree with this factual allegation, they may contest it at trial. *See IT Group, Inc. v. D'Aniello*, No. 04–1268, 2005 WL 3050611, at *15–16, 2005 U.S. Dist. LEXIS 27869, at *54–55 (D.Del. Nov. 15, 2005) (rejecting the argument that the complaint failed to disclose how the transferor received less than reasonably equivalent value); *Official Comm. Of Unsecured Creditors v. DVI Bus. Credit, Inc. (In re DVI, Inc.)*, 326 B.R. 301, 309–10 (Bankr.D.Del.2005) (denying the defendant's motion to dismiss where the Committee failed to account for the value received in exchange for the transfers); *Neilson v. Southern (In re*

*Webvan Group, Inc.)*, No. 01–2404, 2004 WL 483580, at *2, 2004 Bankr.LEXIS 270, at *7 (Bankr.D.Del. Mar. 9, 2004) (holding that an allegation that Debtor received less than reasonably equivalent value was sufficient to survive a motion to dismiss); *see also Litig. Trust of MDIP Inc. v. De La Rue Cash Sys. Inc. (In re MDIP Inc.)*, 332 B.R. 129, 133 (Bankr.D.Del.2005) ("reasonable equivalence has a large factual component.").

Though the complaint at times lacks precision,[4] the allegations contained therein satisfy the applicable pleading requirements. Therefore, the defendants' motion to dismiss Count VII is denied.

*VIII. Eighth Counterclaim—State Law Fraudulent Transfers*

■ Count VIII seeks to avoid and recover certain fraudulent transfers under applicable state law. The defendants raise many of the same arguments discussed in Counts V, VI, and VII above. However, the defendants also urge that Count VIII must be dismissed for another reason: a failure to specify a precise statute. In the defendants' words, "Plaintiff's failure to allege any specific state law or any other particulars reduces the Defendants to 'guesswork and conjecture' in responding to the Complaint" (Adv.Doc. # 22, p. 21) (*citing Pardo v. Avanti Corporate Health Sys. (In re APF Co.)*, 274 B.R. 634, 640 (Bankr.D.Del.2001)).

The defendants' reliance on *APF* is misplaced. There, I dismissed a complaint for

---

4. The complaint stretches 37 pages, contains one-hundred paragraphs, and has ten separate counts.

This type of pleading has been referred to as a "shotgun" pleading by some courts. "The typical shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions. Consequently, in ruling on the sufficiency of a claim, the trial court must sift out the irrelevancies, a task that can be quite onerous."

*In re DVI, Inc.*, 326 B.R. 301, 309 (Bankr. D.Del.2005) (*quoting Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir.2002)).

failing to meet the requisite pleading standards. This had nothing to do with the trustee's failure to identify a particular fraudulent transfer statute:

> [The defendant] contends the Trustee must specifically plead the existence of an identified creditor who held a claim at the time of the transfer and the state law pursuant to which he is proceeding. I am not persuaded that a trustee must do so, but I agree with [the defendant] that in this case, the Trustee's complaint is deficient.

*In re APF Co.*, 274 B.R. at 639. Under the Federal Rules, "the failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim." *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 (2d Cir.1997); *see Ghebreselassie v. Coleman Sec. Serv.*, 829 F.2d 892, 895 (9th Cir.1987) ("a properly pleaded claim in federal court need not specify under which law it arises.").

Accordingly, to survive dismissal, the complaint need not identify a particular state's uniform fraudulent transfer law. *See Weston v. Pennsylvania*, 251 F.3d 420, 429 (3d Cir.2001) ("Complaints need not plead law or match facts to every element of a legal theory." (citation and quotations omitted)); *see, e.g., Argus Mgmt. Group v. Rider (In re CVEO Corp.)*, No. 03–50377, 2004 WL 2049316, at *3, 2004 Bankr.LEXIS 1343, at *9 (Bankr.D.Del. Sept. 13, 2004) ("we will not dismiss the Complaint on the grounds that the Plaintiff failed to plead the specific state [fraudulent transfer] law applicable to the allegations asserted therein.").

In coming to this conclusion, the Court notes that it can find no support in the Federal Rules for the suggestion that the pleader must cite to a particular statute:

> Although it is common to draft complaints with multiple counts, each of which specifies a single statute or legal rule, nothing in the Rules of Civil Procedure requires this. To the contrary, the rules discourage it. Complaints should be short and simple, giving the adversary notice while leaving the rest to further documents. "The forms contained in the Appendix of Forms are sufficient under the rules and are intended to indicate the simplicity and brevity of statement which the rules contemplate." FED. R. CIV. P. 84. None of the forms in the appendix spells out a legal theory.

*Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir.1992); *see* FED. R. CIV. P. FORM 13 (alleging a Fraudulent Conveyance without pleading law). Nevertheless, the Court acknowledges that *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston, (In re Exide Techs., Inc.)*, 299 B.R. 732 (Bankr.D.Del.2003), came to a different result. There, while the court dismissed five separate counts alleging fraudulent transfers under unspecified state(s) law, it readily granted leave to amend the complaint to rectify the deficiencies. *In re Exide*, 299 B.R. at 749. Given the above cited authorities for this Court's position here, the Court is content to allow state law particulars to be developed in the discovery process. Consequently, the motion to dismiss Count XIII is denied.

## IX. Ninth Counterclaim—Breach of Contract

■ Count IX has two theories: breach of an express contract and breach of an implied contract. The defendants argue that both theories "must be dismissed because (i) Plaintiff has not identified any provision of the Financial Advisory Agreement that has been breached; and (ii) the allegations underlying Plaintiff's implied contract theory do not support a finding that any such implied con-

tract existed" (Adv.Doc. 22, p. 36). The Court disagrees.

The liberal standards of notice pleading do not require a plaintiff to identify the specific contract provision at issue. Rule 8 simply does not require such specificity; it merely requires that a complaint provide the defendant with fair notice. FED. R. CIV. P. 8(a); *see Otani v. State Farm Fire & Cas. Co.*, No. 96–16313, 1997 WL 367861, at *2, 1997 U.S.App. LEXIS 16384, at *5 (9th Cir. July 2, 1997) (reversing the dismissal of a breach of contract claim where dismissal was based primarily on the complaint's failure to identify a specific contract provision); *D'Accord Fin. Servs., Inc. v. Metsa–Serla Oy*, No. 98CIV5847, 1999 WL 58916, at *6, 1999 U.S. Dist. LEXIS 1202, at *19 (S.D.N.Y. Feb. 8, 1999) (noting that pleading a specific contract provision may not be necessary).

In *Mellencamp v. Riva Music, Ltd.*, 698 F.Supp. 1154 (S.D.N.Y.1988), for example, the defendants argued that the "breach of contract should be dismissed because it fail[ed] to specify the contracts and specific contract provisions at issue in the lawsuit." *Id.* at 1160. The court disagreed, stating that "[i]t is now axiomatic that a complaint need only provide 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* (quotations and citation omitted).

A fair reading of the complaint provides the defendant with the necessary notice of what the claim is and the grounds upon which it rests. The complaint contains the requisite factual allegations. Such factual allegations support the conclusion that there is a valid contract, that the Debtors had complied with the contract by performing their obligations, that all conditions precedent were fulfilled, that there was a breach, and that the Debtors were damaged from that breach. The defen-

dants' only gripe is that a specific provision is not identified; however, this cannot prove fatal at this early stage of the proceeding.

Rule 8 "permits a plaintiff to assert the existence of an express, written contract either by setting it forth verbatim in the complaint, or the plaintiff may 'attach a copy as an exhibit, or plead it according to its legal effect.'" *Pierce v. Montgomery County Opportunity Bd.*, 884 F.Supp. 965, 970 (E.D.Pa.1995); *Stephens v. American Home Assurance Co.*, 811 F.Supp. 937, 958 (S.D.N.Y.1993); *Goshen Veneer Co. v. G & A Aircraft, Inc.*, 3 F.R.D. 344, 345 (E.D.Pa.1944); 5 CHARLES A. WRIGHT, ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1235 at 272–73 (1990).

Here, the plaintiff has plead the contract's legal effect. As such, the plaintiff's claim of breach of an express contract must go forward.

Likewise, the Court rejects the defendants' contentions that the allegations do not support a finding of an implied contract. The defendants' argument is nothing more than an assertion that the plaintiff will not ultimately prevail on the merits. Yet "[t]he issue here is not whether the Liquidating Trust will ultimately prevail on these claims, but only whether the plaintiff may put on evidence to support them." *Liquidating Trust of U.S. Wireless Corp. v. Bhatnagar (In re U.S. Wireless Corp., Inc.)*, 333 B.R. 688, 692 (Bankr.D.Del.2005).

Accordingly, the defendants' motion to dismiss Count IX is denied.

## X. *Tenth Counterclaim—Deepening Insolvency*

The tenth claim of the complaint alleges a cause of action for deepening insolvency. Courts and commentators have expressed divergent views about the theory of deep-

ening insolvency. Indeed, courts do not agree whether deepening insolvency even exists. If it exists, however, many have struggled with whether it is simply a measure of damages or whether it is a distinct cause of action. Those that have determined that it is a cause of action are then faced with defining the elements and scope of the tort. Even once defined, there is debate about the proper measure of damages. Being confronted with only a motion to dismiss, this Court need not attempt to answer the many questions relating to deepening insolvency. Still, this Court must at least determine whether the applicable state law would recognize deepening insolvency as a distinct cause of action.

The first issue, thus, is what state's law applies. The parties dispute this issue but neither party makes its position entirely clear. Instead, the parties suggest that either the law of Delaware, North Carolina, or New York law would control. Because this Court believes the result would be identical regardless of which law applies, the choice of law issue need not be decided on this motion. *See Litig. Trust of MDIP Inc. v. De La Rue Cash Sys. Inc. (In re MDIP, Inc.),* 332 B.R. 129, 132 (Bankr.D.Del.2005).

Unfortunately, it appears that neither the Delaware Supreme Court, the New York Court of Appeals, nor the North Carolina Supreme Court have weighed in on the validity of a claim of deepening insolvency. *Bondi v. Bank of Am. Corp. (In re Parmalat Sec. Litig.),* 383 F.Supp.2d 587, 601 (S.D.N.Y.2005) ("North Carolina courts barely have considered this question."); *Kittay v. Atl. Bank (In re Global Serv. Group LLC),* 316 B.R. 451, 458 (Bankr.S.D.N.Y.2004) (stating that no reported New York case has ruled that deepening insolvency is a tort and implying that no New York case has ruled that

it is not); *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston, (In re Exide Techs., Inc.),* 299 B.R. 732, 751 (Bankr.D.Del.2003) ("The Supreme Court of Delaware has not spoken on the tort of deepening insolvency.").

However, several federal courts, applying each of these states' laws, have addressed the issue. Those decisions are far from uniform. *Compare In re Parmalat,* 383 F.Supp.2d at 602 (declining to decide whether North Carolina would recognize deepening insolvency but implying that it would not), *and Rafool v. Goldfarb Corp. (In re Fleming Packaging Corp.),* No. 04–8166, 2005 WL 2205703, at *10, 2005 Bankr.LEXIS 1740, at *33 (Bankr.C.D.Ill. Aug. 26, 2005) (questioning the validity of deepening insolvency under Delaware law), *and In re Global Serv.,* 316 B.R. at 457–60 (granting motion to dismiss deepening insolvency claim under New York law), *with TUG Liquidation, LLC v. Atwood (In re BuildNet, Inc.),* No. 01–82293, 2004 WL 1534296, at *7, 2004 Bankr.2383, at *21 (Bankr.M.D.N.C. June 16, 2004) (applying North Carolina law and recognizing-but dismissing on different grounds-a claim for deepening insolvency), *and In re Exide Techs.,* 299 B.R. at 752 (Bankr.D.Del.2003) (predicting the Delaware Supreme Court would recognize the tort of deepening insolvency), *and Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.),* 340 B.R. 1 (Bankr.E.D.N.Y.2006) (denying motion to dismiss deepening insolvency claim under New York law).

In the last few years, a growing number of federal courts have issued opinions strongly implying that deepening insolvency aught not be recognized as an independent tort. It appears that Judge Bernstein led the charge in *In re Global Serv.,* 316 B.R. 451. In that case, the court observed that "[t]he distinction between 'deepening insolvency' as a tort or damage

theory may be one unnecessary to make." *Id.* at 458. The court went on to hold that "one seeking to recover for 'deepening insolvency' must show that the defendant prolonged the company's life in breach of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation and its increased debt." *Id.* As a result of this interpretation, a number of courts have rejected deepening insolvency as a cause of action. *See, e.g., In re Parmalat,* 383 F.Supp.2d at 602 (dismissing deepening insolvency claim as duplicative under New York law); *Alberts v. Tuft (In re Greater Southeast Cmty. Hosp. Corp.),* 333 B.R. 506, 517 (Bankr.D.D.C.2005) (same under the District of Columbia's law); *Official Comm. of Unsecured Creditors of Vartec Telecom, Inc. v. Rural Tel. Fin. Coop. (In re Vartec Telecom, Inc.),* 335 B.R. 631, 644 (Bankr. N.D.Tex.2005) (same under Texas law); *see also In re Fleming Packaging Corp.,* 2005 WL 2205703, at *9, 2005 Bankr.LEXIS 1740, at *29 ("If the elements of a deepening insolvency claim are identical to a breach of fiduciary claim, even if cast in slightly different terminology, dismissal . . . would be appropriate since duplicative counts are properly dismissed.").

To come to this conclusion, the *Global Service* court traced the theory of deepening insolvency to its roots:

"Deepening insolvency" refers to the "fraudulent prolongation of a corporation's life beyond insolvency," resulting in damage to the corporation caused by increased debt. *Schacht v. Brown,* 711 F.2d 1343, 1350 (7th Cir.), *cert denied,* 464 U.S. 1002, 104 S.Ct. 508–09, 78 L.Ed.2d 698 (1983). Its origin has been traced to *Bloor v. Dansker (In re Investors Funding Corp. of New York Sec. Litig.),* 523 F.Supp. 533 (S.D.N.Y.1980). *See* Mette H. Kurth, *The Search for Accountability: The Emergence of "Deepening Insolvency" as an Indepen-*

*dent Cause of Action,* 9 ANDREW'S BANKR. LITIG. REP. 6 (Aug. 27, 2004). There, the complaint alleged that the debtor's insiders (the Danskers) embarked on a scheme to loot the corporate debtor. *In re Investors Funding Corp.,* 523 F.Supp. at 536. Relying on a false picture of the debtor's financial well-being, they induced creditors and shareholders to invest more funds in the company. Thereafter, they misappropriated a portion of the funds that were raised. *See id.* at 536.

Peat, Marwick, Mitchell & Co. ("PMM") had served as the debtor's outside auditor. The debtor's chapter X trustee sued PMM, charging that the Danskers used the false financial statements that PMM had certified to further their scheme. *Id.* at 537. PMM moved for partial judgment on the pleadings or for partial summary judgment, and argued, inter alia, that the knowledge and wrongful conduct of the insiders should be imputed to the debtor's insiders to defeat recovery. *Id.* at 533.

PMM's argument invoked the "adverse interest" exception to the general rule that the agent's knowledge will be imputed to his principal. According to the District Court, the "adverse interest" exception applied if the agent acted adversely to the interest of his principal, but did not apply "where the agent is also acting for the principal's benefit, even though the agent's primary interest is inimical to that of the principal." *Id.* at 541. PMM urged that although the Dansker's were motivated by personal interests, the complaint also alleged that the debtor benefitted from the infusion of funds.

In words that begat the theory of "deepening insolvency," the District Court rejected the notion that acts that prolong a

corporation's existence automatically confer a benefit on the corporation:

> [E]ven to the extent one focuses upon the artificial financial picture of IFC [the debtor] created by the Danskers which prolonged IFC's existence several years beyond its actual insolvency, PMM's position is not persuasive. *A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it.* The complaint plainly alleges that, as a result of the Danskers' practices, IFC's financial situation was caused to deteriorate even further after 1971. Accepting the allegations of the complaint as true, it is manifest that the prolonged artificial solvency of IFC benefited only the Danskers and their confederates, not IFC.

*Id.* (emphasis added).

What began as a justification for recognizing the "adverse interest" exception soon morphed into a theory of recovery. *In re Global Serv.,* 316 B.R. at 456–57.

The "morph[ing]" that *Global Service* describes seems to have occurred in three steps. The process started with *Bloor v. Dansker (In re Investors Funding Corp. of New York Sec. Litig.),* 523 F.Supp. 533 (S.D.N.Y.1980), discussed above. There, the District Court stated that "[a] corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it." *Id.* at 541. In other words, *Investors Funding* merely held that prolonging a debtor's corporate life was not necessarily a benefit. Three years later, the Seventh Circuit took the holding of *Investors Funding* a step further in *Schacht v. Brown,* 711 F.2d 1343 (7th Cir.1983), *cert denied,* 464 U.S. 1002, 104 S.Ct. 508–09 (1983). In *Schacht,* the Seventh Circuit concluded that not only was prolonging a failing corporation's life not beneficial, it was a harm to the

firm. According to the Seventh Circuit, "the corporate body is ineluctably damaged by the deepening of its insolvency, through increased exposure to creditor liability." *Id.* at 1350. After *Schacht,* courts began to recognize deepening insolvency as a distinct injury. From there, applying the venerable principle that "where there is an injury, the law provides a remedy," the Third Circuit in *Official Comm. of Unsecured Creditors v. R.F. Lafferty Co., Inc.,* 267 F.3d 340, 351 (3d Cir.2001), determined that Pennsylvania would recognize deepening insolvency as a cause of action.

After relaying much of the above history, *Global Service* continued its analysis by collecting the relevant authorities, including *Lafferty.* Once collected, the court addressed the facts of the case before it and rejected a claim that a plaintiff could recover for deepening insolvency "because the bank made a loan that it knew or should have known Global could never repay." *In re Global Serv.,* 316 B.R. at 459. In the court's words, "[t]his may be bad banking, but it isn't a tort." *Id.*

As *Global Service* makes clear, simply lending to an insolvent corporation, without more, cannot possibly be a tort. *Id.* A result contrary to that articulated in *Global Service* would be unfortunate. Encouraging lending to a troubled company can be a good thing, not a tort. To that extent, this Court agrees with *Global Service.* However, this Court will not follow *Global Service* to the extent that decision rejects the vitality of a cause of action for deepening insolvency.

■ Although this Court is aware of the mounting pile of authority rejecting such a cause of action, this Court is bound to rule as the applicable state's court of last resort would under the circumstances. *Lafferty,* 267 F.3d at 349 ("In the absence

of an opinion from the state's highest tribunal, we must don the soothsayer's garb and predict how that court would rule if it were presented with the question."). Put differently, this Court must determine what the Third Circuit would predict the state law was with regard to deepening insolvency as an independent tort. In light of the Third Circuit's decision in *Lafferty*, this Court holds that Delaware, New York, and North Carolina courts would recognize deepening insolvency as a cause of action.

*Lafferty's* words, though sometimes questioned, are clear: "[w]e conclude that 'deepening insolvency' constitutes a valid cause of action under Pennsylvania state law . . . ." *Id.* at 344. In this Court's view, *Lafferty* expressly held that "deepening insolvency" was a cause of action rather than a measure of damages. In recognizing deepening insolvency as a cause of action, the Third Circuit "believe[d] that the soundness of the theory, its growing acceptance among courts, and the remedial theme in Pennsylvania law would persuade the Pennsylvania Supreme Court to recognize 'deepening insolvency' . . . ." *Id.* at 352.

It is not for this Court to question the Third Circuit's view of the soundness of the theory. Moreover, although many courts have rejected the theory of deepening insolvency, other courts continue to accept its validity. *See, e.g., Stanziale v. Pepper Hamilton, LLP, (In re Student Fin. Corp.)*, 335 B.R. 539, 548 (D.Del.2005) (following *Lafferty*); *Miller v. Dutil (In re Total Containment, Inc.)*, 335 B.R. 589, 619 (Bankr.E.D.Pa.2005) (same); *In re LTV Steel Co.*, 333 B.R. 397, 422 (Bankr. N.D.Ohio 2005) (noting the growing acceptance of deepening insolvency and collecting cases). Finally, Delaware, New York, and North Carolina law, all adhere to the broad remedial themes discussed in *Lafferty*.

*A. Soundness of the Theory*

The soundness of the theory, rests in part, on the necessity to remedy certain harms. *Lafferty* identified two broad categories of harm. First, the Third Circuit discussed harms associated with causing a corporation to petition for bankruptcy:

> For example, to the extent that bankruptcy is not already a certainty, the incurrence of debt can force an insolvent corporation into bankruptcy, thus inflicting legal and administrative costs on the corporation. *See* Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance* 487 (5th ed.1996) ("[B]y issuing risky debt, [a corporation] gives lawyers and the court system a claim on the firm if it defaults."). When brought on by unwieldy debt, bankruptcy also creates operational limitations which hurt a corporation's ability to run its business in a profitable manner. *See id.* at 488–89. Aside from causing actual bankruptcy, deepening insolvency can undermine a corporation's relationships with its customers, suppliers, and employees. The very threat of bankruptcy, brought about through fraudulent debt, can shake the confidence of parties dealing with the corporation, calling into question its ability to perform, thereby damaging the corporation's assets, the value of which often depends on the performance of other parties. (citation omitted).

*Lafferty*, 267 F.3d at 349–50. Second, *Lafferty*, relying on the Seventh Circuit in *Schacht v. Brown*, identified damages associated with the "dissipation of corporate assets" arising from not dissolving the corporation in a timely manner. *Id.* at 350. This harm could supposedly be "averted, and the value within an insolvent corpora-

tion salvaged . . . ." *Id. Lafferty* explained this position by quoting *Schacht v. Brown:*

> Cases [that oppose "deepening insolvency"] rest[ ] upon a seriously flawed assumption, i.e., that the fraudulent prolongation of a corporation's life beyond insolvency is automatically to be considered a benefit to the corporation's interests. This premise collides with common sense, *for the corporate body is ineluctably damaged by the deepening of its insolvency, through increased exposure to creditor liability. Indeed, in most cases, it would be crucial that the insolvency of the corporation be disclosed, so that shareholders may exercise their right to dissolve the corporation in order to cut their losses.* Thus, acceptance of a rule which would bar a corporation from recovering damages due to the hiding of information concerning its insolvency would create perverse incentives for wrong-doing officers and directors to conceal the true financial condition of the corporation from the corporate body as long as possible.

*Lafferty,* 267 F.3d at 350 (*quoting Schacht,* 711 F.2d at 1350).

▬ In this case, the complaint alleges that "CFSB induced the Debtors to continue their costly borrowing and financing policies and practices, despite knowledge that the Debtors were insolvent;" the complaint continues and states that "CFSB should have been preparing the Debtors for bankruptcy by attempting to conserve all assets" (Adv.Doc. # 1, ¶ 99). Thus, the plaintiff complains of a type of harm contemplated by *Schacht*—a failure to dissolve the corporation in a timely manner.

However, the complaint also states that the "Debtors' financial problems were a result of, among other factors, CFSB's encouragement of the continued use of the LAP, a downturn in the manufactured housing industry, a weakened economy,

and, as it turns out, at least in part from borrowing, lending, loan servicing and financing practices that led to an increasingly large number of delinquent loans and repossessions that in turn lead to the Debtors' insolvency, deepening insolvency, and bankruptcy" (Adv.Doc. # 1, ¶ 32). Elsewhere, the complaint states that the LAP Program not only "deepened the insolvency of the Debtors but, eventually drove them into bankruptcy" (Adv. Doc # 1, ¶ 19). Thus, the complaint also alleges a harm based on the defendants causing the Debtors to petition for bankruptcy.

Depending upon the circumstances, these two theories are not inconsistent. This Court could imagine a situation where a defendant's actions could damage the debtor's business so irreparably that the corporation would eventually have to petition for bankruptcy. The defendant's actions could then artificially prop-up the debtor, delaying the bankruptcy. Thus, under this scenario, the debtor would suffer two distinct harms: first, the costs of bankruptcy, second, the costs of not filing the bankruptcy soon enough. In any event, the Federal Rules allow inconsistent pleadings. FED. R. CIV. P. 8(e)(2). Whether the plaintiff will ultimately prevail on their task of proving that the defendants caused their bankruptcy is a matter not appropriately resolved on a motion to dismiss.

As is clear from the above, the plaintiff's alleged harms are of the sort that were explicitly recognized in *Lafferty* as requiring a remedy.

### B. Growing Acceptance

The Third Circuit also relied on deepening insolvency's "growing acceptance among courts." *Lafferty,* 267 F.3d at 352. Again, it may be questioned whether deepening insolvency is continuing to gain acceptance or whether it is now falling into

disfavor. Luis Salazar, *Is the Tide Turning on D & O Claims?* 24–3 ABIJ 1, at *45 (April 2005)(speculating *Global Service* dealt a "crippling blow" to deepening insolvency claims). Nevertheless, this Court notes that many jurisdictions continue to accept the vitality of deepening insolvency as an independent cause of action. *See In re LTV Steel Co.*, 333 B.R. 397, 422 (Bankr.N.D.Ohio 2005) (collecting cases). Moreover, this Court cannot depart from binding Third Circuit precedent with the ebbs and flows of nonbinding authority.

### C. Remedial Nature

As the Third Circuit recognized Pennsylvania law's remedial theme, so too will this Court recognize the remedial themes of Delaware, New York, and North Carolina. It may be argued that the Third Circuit's decision does not actually bind this Court in the instant matter because *Lafferty* interpreted only Pennsylvania law. But I do not find this distinction meaningful. Upon examination of the relevant state laws, this Court finds that the reasoning of *Lafferty* would apply with equal force to each.

*Lafferty* noted that Pennsylvania adopts the commonly accepted principle that "where there is an injury, the law provides a remedy." *Lafferty*, 267 F.3d at 351. The court also noted that such a venerable principle is accepted in "most common law

jurisdictions." *Id.* Certainly, Delaware, New York, and North Carolina adopt this broad principle. *Jackson v. Bumgardner*, 318 N.C. 172, 347 S.E.2d 743, 748 (N.C. 1986) (noting "the principle that for every injury there is a remedy."); *Robb v. Pennsylvania R.R. Co.*, 210 A.2d 709, 714 (Del. 1965) ("It is the duty of the courts to afford a remedy and redress for every substantial wrong."); *Battalla v. State of New York*, 10 N.Y.2d 237, 219 N.Y.S.2d 34, 176 N.E.2d 729, 730 (N.Y.1961) ("It is fundamental to our common-law system that one may seek redress for every substantial wrong.").

Therefore, this Court concludes that the Third Circuit would recognize a cause of action for deepening insolvency under these state's laws absent a state court's decision to the contrary. *Lennig v. New York Life Ins. Co.*, 130 F.2d 580, 581 (3d Cir.1942). At this point, neither party has called this Court's attention to any state court decision that would alter *Lafferty's* result. Faced with this silence, *Lafferty* controls.[5]

The inquiry, however, is far from over. This Court must still determine the scope of deepening insolvency. Unfortunately, *Lafferty* failed to "specify the elements of a deepening insolvency claim." *In re Student Fin. Corp.*, 335 B.R. at 548. Still, *Lafferty* provides some guidance: "the Committee alleges an injury to the Debt-

---

**5.** Although neither party has pointed this Court to any relevant state court authority, state courts appear to be taking up the issue with increased frequency. *See, e.g., MCA Fin. Corp. v. Thornton*, 263 Mich.App. 152, 687 N.W.2d 850, 858 (2004) (suggesting Michigan might recognize a deepening insolvency claim); *Coroles v. Sabey*, 79 P.3d 974, 983 (Utah Ct.App.2003) (declining to recognize deepening insolvency); *Bondi v. Citigroup, Inc.*, BER–L–10902–04, 2005 WL 975856, at *21 (N.J.Super.Ct. Feb. 28, 2005) (same). Since *Lafferty*, the Delaware Court of Chancery has focused more closely on exploring

fiduciary duties and causes of action in the "vicinity of insolvency." *See Rapoport v. Litig. Trust of MDIP, Inc.*, CA No. 1035–N, 2005 WL 3277911, at *5 n. 70, 2005 Del. Ch. LEXIS 180, at *25, n. 70 (Del.Ch. Nov. 23, 2005). Indeed, Delaware Courts may soon confront the issue. *See id.* ("This action will likely raise at least one novel issue of Delaware corporate law: whether directors and officers' duties change materially in the face of 'deepening insolvency.'"). Nevertheless, at this time, the Court has been pointed to no such state law that would alter the result which *Lafferty* demands.

ors' corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life. This type of injury has been referred to as 'deepening insolvency.'" *Lafferty*, 267 F.3d at 347. Both the District Court of Delaware and the District Court for the Eastern District of Pennsylvania have interpreted this language to require a showing of fraud. *See, e.g., In re Student Fin. Corp.*, 335 B.R. at 548; *Miller v. Dutil (In re Total Containment, Inc.)*, 335 B.R. 589, 620 (Bankr. E.D.Pa.2005); *Seitz v. Detweiler, Hershey, & Assocs., P.C. (In re CITX Corp., Inc.)*, 03–727, 2005 WL 1388963, at *10, 2005 U.S. Dist. LEXIS 11374, at *31 (E.D.Pa. June 7, 2005); *Corporate Aviation Concepts, Inc., v. Multi–Serv. Aviation Corp.*, 03–3020, 2004 WL 1900001, at *4 (E.D.Pa. Aug.25, 2004).

■ Although most courts in this Circuit have required a showing of fraud, the plaintiff argues that *Lafferty* does not require such an element (Adv.Doc. # 38, pp. 29–30). The plaintiff has some support for its argument. For example, *Lafferty* relied on *In re Gouiran Holdings, Inc.*, 165 B.R. 104 (E.D.N.Y.1994). That case, as stated in *Lafferty*, refused to dismiss claims brought by a committee because it was possible that "under some set of facts two years of negligently prepared financial statements could have been a substantial cause of [the debtor] incurring unmanageable debt and filing for bankruptcy protection." *Lafferty*, 267 F.3d at 350–51 (*quoting In re Gouiran Holdings, Inc.*, 165 B.R. at 107 (E.D.N.Y.1994)). Thus, in crafting the deepening insolvency theory, *Lafferty* relied on a case that permitted recovery for mere negligence. Despite this, *Lafferty* talks in terms of fraud. Thus, this Court will follow the line of authority that requires a showing of fraud for a successful claim of deepening insolvency. In this Court's view, this path more closely tracks the express holding of *Lafferty*.

The plaintiff, therefore, is required to show fraudulent conduct-not mere negligence. *In re Student Fin. Corp.*, 335 B.R. at 548. *But see Crowley v. Chait*, No. 85–2441, 2006 U.S. Dist. LEXIS 8894, at *14 (D.N.J. Mar. 7, 2006)(declining to restrict deepening insolvency to allegations of fraud); *In re LTV Steel Co.*, 333 B.R. 397, 421 (holding deepening insolvency can be based on negligence); *Tabas v. Greenleaf Ventures, Inc. (In re Flagship Healthcare, Inc.)*, 269 B.R. 721, 728–29 (Bankr.S.D.Fla. 2001) (same); *In re Gouiran Holdings, Inc.*, 165 B.R. at 107 (same).

Although different courts express the elements of fraud in slightly different terms, fraud generally has five elements: "a representation of material fact, falsity, scienter, reliance and injury." *Vermeer Owners, Inc. v. Guterman*, 78 N.Y.2d 1114, 578 N.Y.S.2d 128, 585 N.E.2d 377, 378 (N.Y.1991); *see also Stephenson v. Capano Dev. Inc.*, 462 A.2d 1069, 1074 (Del.1983); *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 374 S.E.2d 385, 391 (1988). Furthermore, the fraudulent conduct must be suffered by the debtor-not merely an individual creditor. *Lafferty*, 267 F.3d at 348–49.

■ The plaintiff here is a Liquidating Trust that "holds the right to prosecute, compromise, and settle all of the Debtors' Estate's Claims and Causes of Action . . . ." (Adv.Doc. # 1, ¶ 9). The plaintiff has no right to prosecute a claim on behalf of an individual creditor. *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972). As such, to establish a successful claim of deepening insolvency, the fraud alleged must be a harm to the corporation. *See id.*

Some commentators have questioned whether deepening insolvency hurts the

firm or whether it merely hurts an individual creditor. *See* Sabin Willet, *The Shallows of Deepening Insolvency*, 60 Bus. Law. 549, 574 (2005) (attacking the notion that a corporation can be harmed by deepening insolvency); J.B. Heaton, *Deepening Insolvency*, 30 Iowa J. Corp. L. 465, 500 (2005) (arguing that certain notions of deepening insolvency are "unsupported in financial economics and inconsistent with the traditional understandings and economic functions of corporate injury."). The Third Circuit, however, has spoken on this issue: such harms hurt the debtor qua debtor. *Lafferty*, 267 F.3d at 348–50. To question that determination is not within the province of this Court. Clearly though, where a defendant's actions are akin to the looting of a corporate debtor, the corporation suffers an injury.

"[A]ccept[ing] as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom," the plaintiff has stated a cause of action for deepening insolvency. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997). These allegations include the following. The defendants acted as the Debtors' insiders, fiduciaries, and exclusive financial advisors (Adv.Doc. # 1, ¶¶ 11, 19, 23, 33, 98). Placed in this position of trust and control, the defendants misrepresented to the Debtors that the LAP Program was sustainable (Adv.Doc. # 1, ¶¶ , 19, 21, 23, 33, 37, 99). This was false (Adv.Doc. # 1, ¶¶ , 19, 21, 22, 23, 33, 37, 98). It can be inferred from the complaint that the defendants made this representation with knowledge (Adv.Doc. # 1, ¶¶ 19, 21, 22, 37, 49, 98). Further, these representations were made with the intent to induce the Debtors into continuing an unsustainable program (Adv.Doc. # 1, ¶ 19, 37, 49, 99).

The Debtors justifiably relied on the advice of their exclusive financial advisors (Adv.Doc. # 1, ¶¶ 21, 31, 32, 33, 98). As a result, the Debtors were injured (Adv.Doc. # 1, ¶¶ 21, 32, 37). This injury resulted from the defendants' deliberate inducement of the Debtors to continue the unsustainable LAP Program. The defendants made such inducements for the purpose of enriching themselves at the expense of the Debtors (Adv.Doc. # 1, ¶ 37). "The net effect of CFSB's knowing activity was to cause the Debtors to remain in business solely for the purpose of generating lender, investment banking, and restructuring and financial advisory fees for the benefit of CSFB" (Adv.Doc. # 1, ¶ 49).

Taken together, these alleged actions show a fraud on the Debtors. The fraud was an expansion of corporate debt and the propping-up of a failed firm. In other words, the complaint "alleges an injury to the Debtors' corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." *Lafferty*, 267 F.3d at 347. Accordingly, the complaint states a claim for deepening insolvency.[6]

However, the defendants argue that even if the complaint states a claim for deepening insolvency, that claim must be dismissed because of the *in pari delicto* doctrine. The phrase *in pari delicto* means "in equal fault." Blacks Law Dictionary (8th ed.2004). The phrase is short for *"in pari delicto potior est conditio defendentis,"* meaning "[i]n case of equal or mutual fault ... the position of the [defending] party ... is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). In other words, "a plaintiff may not assert a claim against a

6. This Court declines to opine what the proper measure of damages for a successful claim of deepening insolvency might be. The parties have not briefed this issue and it would be premature to address it here.

defendant if the plaintiff bears fault for the claim." *Lafferty*, 267 F.3d at 354; *see also Byers v. Byers*, 223 N.C. 85, 25 S.E.2d 466, 469–70 ("The law generally forbids redress to one for an injury done him by another, if he himself first be in the wrong about the same matter whereof he complains.... No one is permitted to profit by his own fraud, or to take advantage of his own wrong, or to found a claim on his own iniquity, or to acquire any rights by his own crime.").

 *In pari delicto* is an affirmative defense. *In re Exide Techs.*, 299 B.R. at 752. Ordinarily, a court cannot consider an affirmative defense on a motion to dismiss. However, where the defense appears on the face of the complaint, a court may properly grant dismissal. *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir.2001)("a complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense ... appears on its face.").[7]

Here, *in pari delicto* does not arise on the face of the complaint. The parties dispute whether the complaint demonstrates that the Debtors participated in the fraudulent conduct (*Compare* Adv.Doc. # 22, pp. 24–25, *with* Adv.Doc. # 38, p. 32). At this stage, however, whether the Debt-

ors did or did not participate in fraud is not determinative of the *in pari delicto* issue.

 The complaint clearly states that the defendants became insiders, fiduciaries, and de facto controllers of the Debtors (Adv.Doc. # 1, ¶¶ 11, 14, 31, 37, 48, 99, 100). *In pari delicto* does not provide a defense for insiders. *In re Student Finance Corp.*, 335 B.R. at 547; *Official Committee of Unsecured Creditors v. William Shapiro*, 99–526, 2001 WL 1468250, at *1, 2001 U.S. Dist. LEXIS 18734, at *5 (E.D.Pa.2001); *Official Committee of Unsecured Creditors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 518 (Bankr.S.D.N.Y. 1999); *Goldin v. Primavera Familienstiftung, TAG Assocs. (In re Granite Partners, L.P.)*, 194 B.R. 318, 332 (Bankr. S.D.N.Y.1996).

As such, *in pari delicto* fails to arise on the face of the complaint and, therefore, cannot bar the plaintiff's claims.

With all this said, some closing observations are necessary. First, the theory of deepening insolvency is one of rapid evolution.[8] Courts have taken differing ap-

---

7. The plaintiff suggests that a court may never consider *in pari delicto* before the filing of an answer. This is incorrect. The plaintiff also asserts that, in the context of a deepening insolvency claim, "courts have been reluctant to apply the *in pari delicto* defense against a bankruptcy trustee ...." (Adv.Doc. # 38, p. 31). Although some courts may have taken this approach, the Third Circuit is not among them. According to the express holding of *Lafferty*, the bankruptcy trustee stands in the shoes of the debtor at the time of the filing (for claims proceeding under § 541). *Lafferty*, 267 F.3d at 357. As a result, there is no judicial reluctance to apply the *in pari delicto* defense to a bankruptcy trustee's claim of deepening insolvency. *Id.* In another context, the plaintiff would be correct, but not here. *See McNamara v. PFS (In re Personal & Bus. Ins. Agency)*, 334 F.3d 239, 246 (3d Cir.2003)

("*Lafferty* does not extend to the situation at bar because the Trustee is acting under § 548 rather than § 541.").

8. No fewer than eight relevant decisions have been rendered since the completion of briefing (July 22, 2005) in the matter before the Court. *See, e.g., In re Greater Southeast Cmty. Hosp. Corp.*, 333 B.R. at 517 (declining to recognize deepening insolvency as an independent tort); *In re Vartec Telecom, Inc.*, 335 B.R. at 633 ("deepening insolvency would not be recognized as a tort under Texas law"); *In re Fleming Packaging Corp.*, 2005 WL 2205703, at *10, 2005 Bankr.LEXIS 1740, at *35 (leaving motion to dismiss a claim of deepening insolvency pending); *In re Monahan Ford Corp.*, 340 B.R. 1, 40 (denying motion to dismiss a clam of deepening insolvency); *In re Student Finance Corp.*, 335 B.R. at

proaches with respect to whether it exists or not, whether it is a cause of action or merely a theory of damages, and if it is a cause of action, whether it requires an already existing duty or tort. *See In re Global Serv.*, 316 B.R. at 457–60 (collecting cases). Second, deepening insolvency, though primarily litigated in federal court proceedings, is a creature of state law. *Lafferty*, 267 F.3d at 344. As such, state courts will have the final word. *Lennig*, 130 F.2d at 581. Third, the complaint articulates the requisite fraudulent conduct: the defendants deliberately misrepresented the sustainability of the LAP Program to enrich themselves by extracting fees from the Debtors. Despite the fact that the complaint alleges such fraud, some statements made elsewhere in the complaint and in the plaintiff's papers cast confusion on the issue (*E.g.* Adv.Doc. # 1, ¶ 22; Adv.Doc. # 38, p. 30; Adv.Doc. # 56, ¶ 5). In the event fraudulent conduct is not alleged, Count X must be dismissed. *See In re Student Fin. Corp.*, 335 B.R. at 548. But from this Court's reading, the complaint adequately sets forth the requisite fraud to maintain an action for deepening insolvency; whether the plaintiff will be able to prove such fraud is a question of fact.

Faced with the rapidly changing nature of the debate, the possibility of state court involvement, and the manner in which the Liquidating Trust has pleaded the action, this Court will treat the motion to dismiss Count X of the complaint as pending.

## Part II—MOTION TO COMPEL

This part of the opinion is with respect to CSFB's motion (Adv.Doc. # 61) to compel the OHC Liquidating Trust to provide an initial damage computation required by Federal Rule of Civil Procedure 26(a)(1)(C). For the reasons set forth below, the motion will be granted.

## BACKGROUND

On July 7, 2005, this Court issued a Scheduling Order, which provided that "Federal Rule of Civil Procedure ('FRCP') Rule 26(a) Initial Disclosures (made applicable to this proceeding by Federal Rule of Bankruptcy Procedure, Rule 7026) shall be served no later than 14 days after entry of the Scheduling Order by the Court" (Adv.Doc. # 42, p. 2). Fourteen days later, on July 21, 2005, the plaintiff delivered its initial disclosures to the defendants (Adv.Doc. # 61, Exh. 1A; Adv.Doc. # 68, Exh. B). These disclosures had no accompanying supporting documents (Adv.Doc. # 61, Exh. 1A; Adv.Doc. # 68, Exh. B).

Part III of the plaintiff's disclosures contained a so-called "computation" of damages. Part III read, in full, as follows:

> The Trust is seeking recovery of certain transfers [that] were preferential and fraudulent. The amount of the transfers currently known and at issue are those articulated in the Trust's pleading in this matter. Moreover, the Trust is claiming unspecified damages as the result of CFSB's breach of fiduciary duties, breach of contract, and wrongful acts in prolonging the Oakwood Companies corporate life in an amount to be proved at trial. Finally, the Trust seeks disgorgement of all unjust profiteering on the part of CSFB.

(Adv.Doc. # 61, Exh. 1A, p. 3–4; Adv.Doc. # 68, Exh. B, p. 3–4). Following this "computation," a series of letters was exchanged between counsel.

548 (stating that deepening insolvency was a tort under Pennsylvania law); *In re Total Containment, Inc.*, 335 B.R. at 619 (following *Lafferty*); *Crowley v. Chait*, 2006 U.S. Dist.

LEXIS 8894, at *14 (same); *In re LTV Steel Co.*, 333 B.R. at 422 (recognizing deepening insolvency as a free-standing tort).

On August 1, 2005, the defendants informed the plaintiff that the disclosure of damages was inadequate under Rule 26(a)(1)(C) (Adv.Doc. # 61, Exh. 1B; Adv. Doc. # 68, Exh. C). Plaintiff responded, on August 8, 2005, expressing its belief that its disclosures met all of the Rule's requirements (Adv.Doc. # 61, Exh. 1C; Adv.Doc. # 68, Exh. A). On August 17, 2005, the defendants responded and strongly reaffirmed their belief that the disclosures failed to meet the requisite standards (Adv.Doc. # 61, Exh. 1D). On August 30, 2005, the plaintiff conceded and supplemented its initial disclosures by providing the amount paid pursuant to its breach of contract claim, $450,000 (Adv. Doc. # 61, Exh. 1E; Adv.Doc. # 68, Exh. D). The supplement did not address damages for any of the other eight damage claims (Adv.Doc. # 61, Exh. 1E; Adv.Doc. # 68, Exh. D). On September 8, 2005, the defendants responded, indicating that they intended to file the instant motion to compel due to the plaintiff's failure to comply with Rule 26(a)(1)(C) (Adv.Doc. # 61, Exh. 1F; Adv.Doc. # 68, Exh. E). On September 13, 2005, the plaintiff responded expressing disappointment in the defendants' decision and stating that the plaintiff was under the impression that an agreement between the parties existed (Adv.Doc. # 61, Exh. 1G; Adv.Doc. # 68, Exh. F). According to the plaintiff, the supplemental disclosure of the amount of the contract claim satisfied the supposed agreement. On September 15, 2005, the defendants sent another letter attempting to correct what it perceived as "unacceptable misstatements" in the September 13 letter (Adv.Doc. # 61, Exh. 1H).

On October 10, 2005, the defendants submitted the instant motion (Adv.Doc. # 61). Apparently, the parties have made a good faith effort to resolve their differences regarding the plaintiff's initial disclo-sure; but they have failed to resolve the issue.

## DISCUSSION

Federal Rule of Civil Procedure 26(a)(1)(C), made applicable here by Federal Rule of Bankruptcy Procedure 7026, requires the plaintiff to disclose basic information regarding damages sought. The rule states as follows:

(1) Initial Disclosures. Except in categories of proceedings specified in Rule 26(a)(1)(E), or to the extent otherwise stipulated or directed by order, a party must, without awaiting a discovery request, provide to other parties:

\* \* \* \* \* \*

(C) a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered....

FED. R. CIV. P. 26(a)(1)(C). When used properly, these disclosure requirements accelerate the flow of basic information between the litigants. FED. R. CIV. P. 26 advisory committee's notes (1993). This flow of information "functions to assist the parties in focusing and prioritizing their organization of discovery." *City & County of San Francisco v. Tutor–Saliba Corp.*, 218 F.R.D. 219, 221 (N.D.Ca.2003). The initial disclosures also enable the parties to assess their risk and undertake an informed settlement analysis. *Id.* More generally, the information facilitates the efficient administration of a case and helps the litigants prepare for trial.

With such goals in mind, courts apply the initial disclosure obli-

gations in a common sense fashion so as to avoid gamesmanship. FED. R. CIV. P. 26 advisory committee's notes (1993). Accordingly, "a party would not be expected to provide a calculation of damages ... [that] depends on information in the possession of another party or person." *Id.* Likewise, a party would not be expected to produce supporting documents that are not reasonably available to it. *Id.* However, the party should disclose "the best information then available" regarding its calculation of damages. 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE—CIVIL § 26.22(4)(c)(ii) (3d ed.2005).

In the instant matter, the plaintiff argues that the mandatory initial disclosure obligations do not apply because the parties have varied the procedure by agreement (Adv.Doc. # 68, p. 2). In the alternative, the plaintiff asserts that it has sufficiently provided a computation of damages (Adv.Doc. # 68, p. 2). Lastly, the plaintiff urges that any deficiency in its computation is excused due to the lack of information reasonably available to it (Adv.Doc. # 68, p. 2). I cannot agree. The documents before me do not reveal any such stipulation; the plaintiff's vague disclosures fall far short of the "computation" requirement; and, such inadequate disclosures cannot be excused as the nature of the complained of damages makes at least some information reasonably available to the plaintiff.

*A. No Stipulation Or Order Excused The Plaintiff's Initial Disclosure Obligations*

■ Throughout its reply brief, the plaintiff boldly asserts that it need not meet its initial disclosure requirements because of an order of this Court and an alleged stipulation between the parties. Specifically, the plaintiff asserts that "the provisions of Rule 26(a)(1) were modified first as to the document production by stipulation, and later as to the damages computations" (Adv.Doc. # 68, p. 7). The defendants hardly respond to these two arguments-and with good reason.

With respect to the first argument, regarding document production, the Court can find no support for the plaintiff's position in the Scheduling Order. Likewise, the Court is not aware of any stipulation that would free the plaintiff from its Rule 26(a) obligations. If there were such an order or stipulation, the plaintiff has not cited it in its brief. To the extent the plaintiff is referring to the Scheduling Order, such reliance is misplaced.

The Scheduling Order explicitly states that "Rule 26(a) Initial Disclosures ... shall be served no later than 14 days after entry of the Scheduling Order by the Court" (Adv.Doc. # 42, p. 2). These disclosures include "documents or other evidentiary material, not privileged or protected from disclosure, on which such [initial] computation is based ...." FED. R. CIV. P. 26(a)(1)(C). Thus, the Scheduling Order, read together with Rule 26(a), clearly and explicitly requires the plaintiff to produce such documents; it in no way excuses such production. Thus, the plaintiff was obliged to produce any documents regarding damages that were reasonably available.

With respect to the plaintiff's argument regarding the sufficiency of the damage calculation, the Court can find no reason why the plaintiff would be excused from performing its Rule 26(a)(1)(C) computation. The plaintiff argues that the defendants "agreed to a compromise, 'starting point' damages calculation, but reneged once they had it" (Adv.Doc. # 68, p. 2). According to the plaintiff, the parties agreed that the plaintiff's damage disclosure with respect to its contract claim extinguished the plaintiff's disclosure obli-

gations with respect to damage computations for all other counts.

It is surpassingly difficult to imagine that the defendants agreed that if the plaintiff were to provide the required calculation as to its contract claim, then its obligations as to the other eight counts would be excused. The complaint alleges nine different causes of action. The contract count has an ascribed value of $450,000 (Adv.Doc. # 61, Exh. 1E; Adv. Doc. # 68, Exh. D). Other counts potentially expose the defendants to liability for hundreds of millions of dollars (*see, e.g.,* Adv.Doc. 1, ¶ 42). As such, the Court agrees with the defendants: "No rational defendant, facing what it is told are hundreds of millions of dollars in damages, would settle for the disclosure made by Plaintiff in the place of the computation required by the Rules" (Adv.Doc. # 76, p. 1).

In the September 15, 2005 letter, the defendants clarify any confusion:

We did not say that if plaintiff were to provide the calculation required under Rule 26(a) as to its contract claim, then its obligations across the board would be satisfied. When you pleaded complete ignorance as to how to begin calculating your claims for damages, we stated *by way of example* that a party seeking to estimate damages under a contract would look, as a matter of common sense, to amounts paid under that contract. We did not say that providing such a number would satisfy plaintiff's obligations as to its other claims; to the contrary, as you well know, we moved on to an extended discussion concerning plaintiff's other claims . . . .

(Adv.Doc. # 61, Exh. 1H)(emphasis in original). Based solely on the briefs and the supporting exhibits, it seems unreasonable for the plaintiff to have held such an interpretation. If the plaintiff honestly believed that such an agreement was in fact in place, the plaintiff should have reduced it to writing.

Federal Rule of Civil Procedure 29 governs stipulations regarding discovery procedures. That rule states that "the parties may by *written* stipulation . . . modify other procedures governing or limitations placed upon discovery . . . ." FED. R. CIV. P. 29 (emphasis added). The plaintiff does not assert that this stipulation was ever reduced to writing. Thus, the Court will not permit the plaintiff to escape its obligations by resort to an oral stipulation which the defendants dispute exists.

*B. The Plaintiff Has Failed To Provide A Computation Of Damages As Required By Rule 26(a)*

As stated above, Rule 26(a)(1) requires that "a party must, without awaiting a discovery request, provide to other parties . . . a computation of any category of damages claimed by the disclosing party . . . ." At issue here is the degree of specificity the plaintiff must provide in its disclosures. This issue turns largely on the meaning of the word "computation."

 Courts have understood the word to require a "specific computation of a plaintiff's damages." *Kleiner v. Burns,* No. 00–2160, 2000 WL 1909470, at *2, 2000 U.S. Dist. LEXIS 21850, at *4 (D. Kan. Dec 22, 2000). This specific computation certainly requires a disclosure of a specific dollar figure. *See Bullard v. Roadway Exp.,* 3 Fed.Appx. 418, 420 (6th Cir.2001)(affirming the District Court's sanctions where "[a]stonishingly" Plaintiff failed to make any reference to a dollar figure); *Synergetics, Inc. v. Lumpkin,* No. 4:04CV1650, 2005 WL 2179648, at *1, 2005 U.S. Dist. LEXIS 32273, at *2 (E.D. Mo. Sept 9, 2005) (granting motion to compel

where the disclosure failed to set out "specific amounts" of damages).[9] Simply reciting a dollar figure, however, is not enough. *Doggett v. Perez*, No. CS-02-282, 2004 WL 2939600, at *5 (E.D.Wash. Mar. 4, 2004) ("plaintiff is to provide more than a lump sum statement of damages sustained."); *First Nat'l Bank of Chicago v. Ackerley Commc'ns, Inc.*, No. 94 Civ. 7539, 2001 WL 15693, at *6, n. 6, 2001 U.S. Dist. LEXIS 20895, at *18, n. 6 (S.D.N.Y. Jan. 8, 2001) ("calculation of damages requires more than merely setting forth the figure demanded.").

The computation requires at least "some analysis." *Tutor–Saliba Corp.*, 218 F.R.D. at 221. The Rule does not place a great burden on the plaintiff. Rather, "[a]ll the claimant needs to do is sit down and calculate the damages that are claimed." *Dixon v. Bankhead*, No. 4:00CV344, 2000 WL 33175440, at *1 (N.D.Fla. Dec. 20, 2000). Then, the plaintiff need only disclose what those damages are and how they got there. *See Tutor–Saliba Corp.*, 218 F.R.D. at 221; *see also Szusterman v. Amoco Oil Co.*, 112 Fed.Appx. 130, 131 (3d Cir. Sept. 30, 2004) (granting a motion to compel where the plaintiff "did not furnish any facts or methodology based on which he calculated his alleged damages ....").

Put summarily, the plaintiff needs to provide the defendants with an initial estimate as to their claimed damages and at least "some analysis" of how the relevant facts lead to that dollar figure. Again, this is not such an onerous task. The plaintiff must merely disclose "the best information then available to it concerning th[e] claim, however limited and potentially changing it may be." 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE—CIVIL § 26.22(4)(c)(ii) (3d ed.2005); *see* FED. R. CIV. P. 26(a)(1)(E) ("A party must make its initial disclosures based on the information then reasonably available to it and is not excused from making its disclosures because it has not fully completed its investigation ...."); *see also* FED. R. CIV. P. 26(e) (stating a party has a continuing duty to supplement).

Likewise, "[i]f estimates are made which might be subject to revision with expert opinion, that is entirely permissible, but the requirements of Fed.R.Civ.P. 26(a)(1)(C) cannot be avoided if the opposing party insists on compliance." *Dixon*, 2000 WL 33175440, at *1. Here, the defendants so insist. As such, the plaintiff must disclose the "best information available to it concerning th[e] claim[s]." 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE—CIVIL § 26.22(4)(c)(ii) (3d ed.2005).

---

9. The plaintiff relies on *Merrill v. Waffle House, Inc.*, 227 F.R.D. 467 (N.D.Tex.2005), for the proposition that it need not provide a dollar figure. In that case, the Court excused the required computation because of the nature of the claimed damages:

"compensatory damages for emotional distress are necessarily vague and are generally considered a fact issue for the jury" and "may not be amenable to the kind of calculation disclosure contemplated by Rule 26(a)(1)(C)." (citations omitted).... Plaintiffs state that they do not intend to ask the jury for a specific dollar amount of damages at trial. (Resp. at 4.) Based on this representation and the Fifth Circuit's holding in *Williams*, Plaintiffs will not be re-

quired to disclose a computation of damages at this time .... To the extent that Plaintiffs attempt to assign a specific dollar figure to their emotional distress damages at trial, Defendant may seek to exclude such evidence as provided by Federal Rule of Civil Procedure 37(c)(1).

*Waffle House*, 227 F.R.D. at 470. In this case, the plaintiff bases its damages on injuries resulting from claims of breach of contract, unjust enrichment, and fraudulent transfer. These types of action are certainly more susceptible to calculation than compensatory damages for emotional distress. Further, the Court presumes that the plaintiff will want to ask for a specific amount of damages at trial.

## C. *The Plaintiff Must Have At Least Some Information Regarding Its Damages*

 Despite this requirement, the plaintiff seeks to escape its obligations by arguing ignorance. The Court will not accept that the plaintiff has absolutely no information with respect to any of its claims and has no documentation to support the allegations of damages in its complaint. If this is indeed the case, there is a far more troubling problem.

The plaintiff must provide additional information with respect to all of its claims for damages. The plaintiff places its causes of action into three basic categories of harm: avoiding power damages, common law damages, and unjust profiteering damages (Adv.Doc. # 68, pp. 8–9).

With respect to its avoiding power damages, the plaintiff correctly points out that the complaint sufficiently provides an estimate as to the possible preferential and fraudulent transfers. But the plaintiff assumably has information and documentation to support these estimated damages.

With respect to its common law claims, the plaintiff argues that "the Rule merely requires that a party exchange, pre-discovery, all basic information relating to damages that it *already has*. The Trust has accomplished that" (Adv.Doc. # 68, p. 11) (emphasis in original). Clearly, such a representation cannot be credited. The plaintiff initially refused to give an estimate to the defendants with respect to its breach of contract claim (Adv.Doc. # 61, Exh. 1A, p. 3–4; Adv.Doc. # 68, Exh. B, p. 3–4). When pressed, however, the plaintiff provided a "rough estimate" (Adv.Doc. # 61, Exh. 1E; Adv.Doc. # 68, Exh. D). The plaintiff should similarly be able to provide a rough estimate for its other common law claims. In addition, the Rule requires more than just a dollar figure. As stated above, the facts and methodology on how the plaintiff came to its estimates must also be disclosed.

In regards to the plaintiff's claimed damages for unjust profiteering, the plaintiff states that it is "nigh-impossible" to articulate a dollar figure (Adv.Doc. # 68, p. 13). The plaintiff also states that "[n]one of the documents reasonably available to the Trust allow it to determine the profits reaped by Defendants as a result of their untoward manipulation of the Debtors" (Adv.Doc. # 68, p. 13). In sum, the plaintiff alleges that "there is no additional 'basic information' that the Trust can disclose at this time regarding its unjust profiteering claim" (Adv.Doc. # 68, p. 14). To review, the plaintiff's initial disclosure with respect to damages is as follows:

> The Trust is seeking recovery of certain transfers [that] were preferential and fraudulent. The amount of the transfers currently known and at issue are those articulated in the Trust's pleading in this matter. Moreover, the Trust is claiming unspecified damages as the result of CFSB's breach of fiduciary duties, breach of contract, and wrongful acts in prolonging the Oakwood Companies corporate life in an amount to be proved at trial. Finally, the Trust seeks disgorgement of all unjust profiteering on the part of CSFB.

(Adv.Doc. # 61, Exh. 1A, p. 3–4; Adv.Doc. # 68, Exh. B, p. 3–4). From the Court's reading, the first two sentences deal with the avoidance power damages. The next sentence deals with the common law damages; and, the last sentence deals with the plaintiff's claim of unjust profiteering. Thus, the total of what the plaintiff has disclosed with respect to its unjust profiteering claim is that "the Trust seeks disgorgement of all unjust profiteering on the part of CSFB" (Adv.Doc. # 61, Exh. 1A, p. 3–4; Adv.Doc. # 68, Exh. B, p. 3–4).

These disclosures, according to the plaintiff, provide the defendants with "enough information to assess their exposure and craft discovery . . . ." (Adv.Doc. # 68, p. 2). In fact, the plaintiff finds it "difficult to fathom what more Defendants could want from the Trust in this early, pre-discovery phase" (Adv.Doc. # 68, p. 14). Contrary to the plaintiff's beliefs, the initial disclosures fall woefully short of meeting the requirements of Rule 26(a)(1)(C).

The defendants motion to compel is granted.

## ORDER

For the reasons set forth in the Court's memorandum opinion of this date, Defendants' motion (Doc. # 21) to dismiss is DENIED as to Counts I through III and V through IX, while as to Count X the motion is deemed pending, and the motion (Doc. # 61) to compel discovery is GRANTED.